Filed 3/4/05 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2005 ND 54

In the Interest of R.F.

North Dakota State Hospital, Petitioner and Appellee

v.

R.F., Respondent and Appellant

No. 20050053

Appeal from the District Court of Stutsman County, Southeast Judicial District, the Honorable Mikal Simonson, Judge.

AFFIRMED.

Opinion of the Court by VandeWalle, Chief Justice.

Jay A. Schmitz, Assistant State’s Attorney, 511 2nd Avenue S.E., Jamestown, ND 58401, for petitioner and appellee.  Submitted on brief.

Thomas E. Merrick, Merrick & Schaar Law Firm, P.O. Box 1900, Jamestown, ND 58402-1900, for respondent and appellant.  Submitted on brief.

Interest of R.F.

No. 20050053

VandeWalle, Chief Justice.

[¶1] R.F. filed an expedited mental health appeal challenging a district court order for hospitalization and treatment.  R.F. argues the district court erred in determining that in-patient hospitalization at the North Dakota State Hospital is the least-

restrictive condition necessary to achieve the purposes of his treatment.  We affirm the district court’s order.  

[¶2] R.F. is a 64-year-old resident of Minnesota who is presently homeless.  R.F. has a bipolar disorder for which he takes medication.  While staying at a shelter in Minnesota, R.F. accidentally overdosed on prescription lithium.  Subsequently, R.F. traveled to a hospital in Grand Forks to have his heart tested.  R.F. suffered from symptoms consistent with a lithium overdose.  The Grand Forks hospital filed a petition for the involuntary commitment of R.F.  The Northeast Central Judicial District Court in Grand Forks County held a preliminary hearing on this matter and found probable cause to believe R.F. was mentally ill and a person requiring treatment.  The court ordered R.F. to be evaluated at the North Dakota State Hospital for a period not to exceed 14 days.  Following their evaluation, the State Hospital filed a Report of Examination and a Report Assessing the Availability and Appropriateness of Alternative Treatment.  The State Hospital noticed R.F. had impaired cognitive abilities and a poor memory, and psychological testing revealed R.F. has early-stage dementia.  After a treatment hearing in the Southeast Judicial District Court in Stutsman County, the district judge issued an order for the hospitalization and treatment of R.F. for 90 days, or until further order of the court. 

I.

[¶3] R.F. wants to be released from the hospital.  R.F. concedes he has a mental illness and is a person requiring treatment.  His sole contention on appeal is that the district court erred by not ordering a less-restrictive treatment regimen.

A.

[¶4] The applicable legal standard for least-restrictive-treatment appeals is well-

established: 

When an individual is found to be a person requiring treatment he has the right to the least restrictive conditions necessary to achieve the purposes of the treatment.  
In re J.K.
, 1999 ND 182, ¶ 15, 599 N.W.2d 337; N.D.C.C. §§ 25-03.1-21 and 25-03.1-40(2).  The court must make a two-part inquiry: (1) whether a treatment program other than hospitalization is adequate to meet the individual’s treatment needs; and (2) whether an alternative treatment program is sufficient to prevent harm or injuries which the individual may inflict upon himself or others.  
In re J.K.
, at ¶ 15.  The court must find by clear and convincing evidence that alternative treatment is not adequate or hospitalization is the least restrictive alternative.  
Id.
  This Court will not set aside the trial court's findings unless they are clearly erroneous.  
Id.
  

Interest of D.Z.
, 2002 ND 132, ¶ 10, 649 N.W.2d 231.  A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence this Court is left with a definite and firm conviction a mistake has been made.  
Interest of H.G.
, 2001 ND 142, ¶ 3, 632 N.W.2d 458.

[¶5] N.D.C.C. § 25-03.1-21(1) provides: 

Before making its decision in an involuntary treatment hearing, the court shall review a report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization which has been prepared and submitted by the state hospital or treatment facility.  If the court finds that a treatment program other than hospitalization is adequate to meet the respondent’s treatment needs and is sufficient to prevent harm or injuries which the individual may inflict upon the individual or others, the court shall order the respondent to receive whatever treatment other than hospitalization is appropriate for a period of ninety days.  

B.

[¶6] The district court’s finding that “a treatment program other than hospitalization is currently not suitable to [R.F.’s] treatment needs” is supported by clear and convincing evidence and is, therefore, not clearly erroneous.  The State Hospital presented sufficient evidence to carry its burden of demonstrating the unsuitability of alternative treatment by introducing Dr. Pryatel’s live testimony at the treatment hearing, his Report of Examination, and his Report Assessing the Availability and Appropriateness of Alternative Treatment.  
See
 
Interest of J.S.
, 499 N.W.2d 604, 606 (N.D. 1993) (discussing the State Hospital’s burden); N.D.C.C. § 25-03.1-19.  Dr. Pryatel identified the following alternative-treatment options in his reports: a homeless shelter or extended-care facility in Minnesota, case management, psychiatric appointments, continued medication, and independent living.  In his live testimony, Dr. Pryatel stated “we’re going to try to down the road try to find some type of placement for him.  A proper setting so he can be maintained on the outside.”  Regarding the status of such a search, the doctor stated “the social worker is looking into it.  It has to be some type of basic care facility or nursing home, something like that.”  At the time Dr. Pryatel gave this testimony, R.F. had been under the supervision of the State Hospital for only 14 days.  
See
 N.D.C.C. § 25-03.1-19 (involuntary treatment hearing must be held within 14 days of the preliminary hearing). 

[¶7] The State Hospital rejected the various alternatives largely out of concern for R.F.’s present condition.  Although R.F. does have an established history of willingly and properly caring for his bipolar disorder by medicinal and professional treatment, Dr. Pryatel diagnosed R.F. with a new illness, early-stage dementia.  The doctor expressed concern that R.F.’s dementia-induced confusion possibly triggered his lithium overdose.  Dr. Pryatel also worried that, in the absence of the hospital’s structure and monitoring, R.F. may fall victim to another dementia-related accident by continuing to self-medicate.  Finally, at the time of the treatment hearing, the State Hospital had yet to isolate the cause of R.F.’s dementia or prescribe proper medication.  Accordingly, the less-restrictive options were permissibly rejected, given the obstacles the alternatives posed to the successful treatment of R.F.’s recently diagnosed dementia and the risks the alternatives held for R.F.’s own well-being.

[¶8] In addition to the district court’s written finding that “a treatment program other than hospitalization is currently not suitable to [R.F.’s] treatment needs,” the district judge made the following oral finding at the treatment hearing:

[R.F.] does not have a home to return to at this point.  He does receive $900 per month in social security disability, which is some income that would be – could assist with low income housing.  And I think it’s possible that he could get an apartment, although those planning and the necessary steps to apply and those types of things have not occurred at this point.  I don’t believe that he’s a danger to others, but he is a danger to himself as evidenced by the overdose with the Lithium, which could have killed him.

I’m confident that the State Hospital will find a place to discharge him to, whether that’s just sending him back to Minnesota or finding him some basic care facility in North Dakota.  And they typically in cases like this, aren’t going to keep [R.F.] any longer than they need to.  However, discharging him to the streets certainly isn’t an option, and another place, another setting has not been arranged.

R.F. questions the role his homelessness played in the district court’s order for in-

patient hospitalization.  We do not believe R.F.’s homeless status was the motivating factor in the district court’s order.  
See
 
Interest of J.A.D.
, 492 N.W.2d 82, 85 (N.D. 1992) (there is no presumption that homeless persons are mentally ill or in need of treatment or that they cannot fend for themselves or take care of their needs).  Rather, R.F.’s homelessness simply indicated an absence of an adequate support system through which he could combat dementia.  This lack of support would not have been resolved by R.F. owning a home.  Therefore, we believe the district court would have ordered in-patient hospitalization regardless of R.F.’s living arrangement.        

[¶9] Although we urge both the State Hospital and the trial courts to, in the future, expound on their reasoning and make more specific findings regarding the suitability and availability of alternative treatments, 
see, e.g.
, 
Interest of D.P.
, 2001 ND 203, ¶ 12, 636 N.W.2d 921; 
Interest of J.K.
, 1999 ND 182, ¶ 19, 599 N.W.2d 337; 
Interest of U.A.M.
, 446 N.W.2d 23, 28 n.4 (N.D. 1989); 
Interest of Daugherty
, 332 N.W.2d 217, 221 n.1 (N.D. 1983), we will not reverse the district court on this record.  The district judge was able to observe the manner and demeanor of the witnesses, including both Dr. Pryatel and R.F.  Under our standard of review, the order for in-

patient treatment was not clearly erroneous.

[¶10] We affirm the district court’s order.

[¶11] Gerald W. VandeWalle, C.J.

Dale V. Sandstrom

William A. Neumann

Mary Muehlen Maring

Kapsner, Justice, dissenting.

[¶12] R.F., by his own admission, is a mentally ill individual requiring treatment.  The question, then, is not whether R.F. should be receiving treatment, but what form the treatment should take.  The State Hospital is the most-restrictive form of treatment for mentally ill individuals.  The record does not clearly and convincingly indicate R.F.’s level of illness mandates in-patient hospitalization and, accordingly, I would reverse the district court’s finding that R.F. is receiving the least-restrictive conditions necessary to achieve the purposes of his treatment and remand for further consideration.

[¶13] R.F. has a history of dealing with his mental problems.  R.F. has demonstrated an understanding of his need for medication and a willingness to seek medical and psychiatric care.  Does the onset of early-stage dementia alter this equation?  Of course.  It alters the analysis to the extent of realizing R.F. is in need of a structured assistance program.  However, confinement in the State Hospital is not the only mechanism capable of providing structure.  The State Hospital did not adequately explain why the identified alternatives were not feasible.  The entire oral testimony on this issue from Dr. Pryatel was as follows:

Q. You believe he needs to be inpatient?

A. Correct.

Q. For how long?

A. Well, I think that we’re going to try to down the road try to find some type of placement for him.  A proper setting so he can be maintained on the outside.

Q. Does he have a home to return to?

A. No.

Q. So what type of – Has there been any inquiries into a setting in which this could be accomplished, or do you know where the status of that is?

A. Well, the social worker is looking into it.  It has to be some type of basic care facility or nursing home, something like that.

Q. Where would this be at?

A. That has not been decided yet.

Q. You haven’t even started the investigation stage for an outpatient placement at this point?

A. Well, one issue is he’s from Minnesota so we need to determine whether he should go back to Minnesota or not.

Q. Has [R.F.] indicated a preference on that?

A. I’m not aware that he has.

Q. So at this point you don’t believe he’s suitable for release?

A. Correct.

Q. Do you have a prognosis of when he might be?

A. Well, we’re asking the court for 90 days, so I’m hopeful that within that time we can find some placement for him on the outside.

Q. But you don’t have anything that’s definite enough to give a time table on at this point?

A. Correct.

[¶14] Dr. Pryatel stressed the need for structure and stabilization.  In his written Report Assessing Availability and Appropriateness of Alternative Treatment, Dr. Pryatel listed various alternatives cited by the majority and, to explain why these alternatives were inappropriate, stated R.F. “is irritable, grandiose, paranoid, has some confusion, and [exhibits] inappropriate touching.”  These symptoms might explain why self-monitoring is inappropriate, but they do not explain why treatment somewhere on the continuum between self-monitoring and hospitalization is not feasible.  The symptoms described in the report as the reasons for hospitalization had been substantially alleviated by the time of the hearing.

Q. There’s quite a bit of talk about the elevated Lithium at the time of admission.  Has the behavior associated with that been alleviated since his admission?

A. Correct.

Q. What is his current behavior?  Is he still evidencing the confused poor cognitive abilities?

A. He still has memory impairment and he appears to be somewhat grandiose, but his behavior is fine.  He’s on Step 2.  He’s on off floor privileges.

Q. And have you seen any evidence of behavior noted in the petition relating to sort of a sexual, overly sexualized speech patterns and so forth?

A. Well, when he was at Altru Hospital he was engaging in some touching behavior, and we saw just a little bit of it here, but not very much.

Q. Has it subsided or is it about the same what little you’ve seen?

A. I think its subsided pretty much.

Q. So I notice in the report of exam that you listed as a possible threat to others, inflicting serious bodily harm on another person, what was the basis for that conclusion?

A. Well, it would be the touching-type behavior.

Q. But you haven’t seen that –

A. It was sexual in orientation.

Q. But you haven’t seen that behavior persisting?

A. No.

Q. So at this point do you still believe that’s a risk?

A. Well, it all depends in the situation that he’s living in.  If he’s living on his own and starts to have exacerbation of his illness, I think it would be more of an issue.  If he’s living in a very structured situation, I don’t think there would be that much of an issue.  Because when he’s living in the structure he’s taking his medications and would be able to control him and so on.

[¶15] The record does not demonstrate these less-restrictive placements were actually considered prior to recommending hospitalization.  Beyond the passing reference to a social worker “looking into it,” the record does not show that a review of the availability and appropriateness of supervised-care facilities occurred.  This absence of information also calls into question how the alternatives that were listed in Dr. Pryatel’s reports were identified, considered, and scrutinized.  The record does not even indicate that other less-restrictive options were unavailable so that hospitalization was necessary.

[¶16] I would remand to the State Hospital and the district court to explain the rationale for discarding alternatives to hospitalization.  
See, e.g.
, 
Interest of D.P.
, 2001 ND 203, ¶ 12, 636 N.W.2d 921; 
Interest of J.K.
, 1999 ND 182, ¶ 19, 599 N.W.2d 337; 
Interest of U.A.M.
, 446 N.W.2d 23, 28 n.4 (N.D. 1989); 
Interest of Daugherty
, 332 N.W.2d 217, 221 n.1 (N.D. 1983).

[¶17] R.F. does not have a statutory right to have someone merely “looking into” a less-restrictive placement or contemplate releasing him into such an alternative “down the road” when the record indicates he is amenable to treatment without the restrictions of being involuntarily committed to the State Hospital.  R.F. has a statutory right to the least-restrictive conditions necessary to achieve the purposes of his treatment.  N.D.C.C. §§ 25-03.1-21, 25-03.1-40(2).  Stated differently, R.F. has the right to have  viable and plausible alternatives adequately and fairly considered before being ordered to the State Hospital for treatment.

[¶18] The district court stated the following regarding R.F.’s hospitalization:

[R.F.] does not have a home to return to at this point.  He does receive $900 per month in social security disability, which is some income that would be – could assist with low income housing.  And I think it’s possible that he could get an apartment, although those planning and the necessary steps to apply and those types of things have not occurred at this point.  I don’t believe that he’s a danger to others, but he is a danger to himself as evidenced by the overdose with the Lithium, which could have killed him.

I’m confident that the State Hospital will find a place to discharge him to, whether that’s just sending him back to Minnesota or finding him some basic care facility in North Dakota.  And they typically in cases like this, aren’t going to keep [R.F.] any longer than they need to.  However, discharging him to the streets certainly isn’t an option, and another place, another setting has not been arranged.

I am not clearly convinced that this type of “nothing-else-to-do-with-him” rationale is sufficient to order in-patient hospitalization.  The extent to which R.F.’s homelessness indirectly played a role in this decision seems troubling.  
See
 
Interest of J.A.D.
, 492 N.W.2d 82, 85 (N.D. 1992).  Further, the district court’s statement that “another place, another setting has not been arranged” is telling.  On its face, the statement seems to suggest that an alternative is possible, just not readily available.  A mentally ill individual has the right to alternative treatment, however, and this right does not cease simply because the alternatives have not been administratively “arranged.”  At the very least, if a less-restrictive program is identifiable and plausible, yet administratively foreclosed, the district court needs to explain these obstacles before ordering hospitalization.

[¶19] The problem with permitting the initial evaluation of viable alternatives to be watered down is that it turns in-patient hospitalization into the norm rather than the exception.  In-patient hospitalization is not a way station at which less-restrictive alternatives are to be leisurely explored.  The danger associated with a de facto reversal of the “analyze-alternatives-first” methodology is that the sense of urgency to explore viable, less-restrictive treatment alternatives understandably wanes once a patient has been hospitalized.

[¶20] I would reverse the district court’s order and remand for the statutorily required consideration of alternative treatment options.

[¶21] Carol Ronning Kapsner