2005 ND 102

In the Interest of R.F.

North Dakota State Hospital,
Petitioner and Appellee

v.

R.F., Respondent and Appellant.

No. 20050148.

Supreme Court of North Dakota.

June 2, 2005.

Leo A. Ryan, Special Assistant Attorney General, Jamestown, ND, for petitioner and appellee.

Thomas E. Merrick, Jamestown, ND, for respondent and appellant.

KAPSNER, Justice.

[¶ 1] R.F. appeals an order from the Southeast Judicial District Court ordering her to be hospitalized at the North Dakota State Hospital ("State Hospital") for continuing treatment until March 8, 2006, or until further order of the court. We affirm.

I.

[¶ 2] R.F., a 51–year–old woman, suffers from what doctors describe as "extremely severe" obsessive-compulsive disorder. She has been treated periodically in the State Hospital for the past eleven years and has received continuous treatment in the State Hospital since 2002. R.F. agrees she has obsessive-compulsive disorder and requires treatment, but she argues her current treatment is ineffective. R.F.'s current treatment includes medication, group therapy, and a behavior modification program. R.F. was examined by three doctors, and all agreed she needs treatment in a highly structured setting. R.F. would prefer to be treated in a different hospital, namely Rogers Memorial Hospital near Milwaukee, Wisconsin. One doctor testified a change of environment may be beneficial to R.F. because she has been receiving treatment at the State Hospital for three years with little progress and R.F. feels she has been "terrorized" by staff at the State Hospital. Two of the doctors agreed R.F. does not currently meet the criteria for treatment at Rogers Memorial Hospital, a private hospital that would cost twice as much as the State Hospital.

[¶ 3] The trial court found R.F. suffers from severe obsessive-compulsive disorder which, if left untreated, poses a serious risk of harm to her. The court further found hospitalization is the only adequate means of treatment for her.

II.

[¶ 4] This Court has clearly articulated the standard applied in least-restrictive treatment appeals:

When an individual is found to be a person requiring treatment he has the right to the least restrictive conditions necessary to achieve the purposes of the treatment. The court must make a two-part inquiry: (1) whether a treatment program other than hospitalization is adequate to meet the individual's treatment needs; and (2) whether an alternative treatment program is sufficient to prevent harm or injuries which the individual may inflict upon himself or others. The court must find by clear and convincing evidence that alternative treatment is not adequate or hospitalization is the least restrictive alternative. This Court will not set aside the trial court's findings unless they are clearly erroneous.

*Interest of R.F.*, 2005 ND 54, ¶ 4, 692 N.W.2d 905 (internal citations omitted). A finding is clearly erroneous if it is induced by an erroneous view of the law, it is unsupported by evidence, or this Court, based on a review of the entire record, has a definite and firm conviction a mistake has been made. *Id.* This Court's review in involuntary commitment cases is limited to the procedures, findings, and conclusions

of the lower court. *Interest of D.P.*, 2001 ND 203, ¶ 3, 636 N.W.2d 921.

[¶ 5] R.F. argues the State Hospital failed to comply with N.D.C.C. § 25–03.1–21(1), which states:

> Before making its decision in an involuntary treatment hearing, the court shall review a report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization which has been prepared and submitted by the state hospital or treatment facility. If the court finds that a treatment program other than hospitalization is adequate to meet the respondent's treatment needs and is sufficient to prevent harm or injuries which the individual may inflict upon the individual or others, the court shall order the respondent to receive whatever treatment other than hospitalization is appropriate for a period of ninety days.

[¶ 6] Dr. Sandra Owens, a psychologist employed by the State Hospital, completed a "Report Assessing Availability and Appropriateness of Alternate Treatment." The report form requires the examiner to "[l]ist in detail any possible programs, facilities, public or private agencies, community resources, etc., whether or not such programs, facilities or resources are appropriate and feasible at the present time." Dr. Owens wrote, "[d]ue to [R.F.] needing a high level of structure in psychiatric setting, no known facility available to meet her needs," because "[s]he is a high risk for AWOL. She is quite high risk for being victimized. [R.F.] is in total denial of her OCD mental illness."

[¶ 7] This Court has found, "[i]n some cases, a reporting doctor may reasonably conclude that less restrictive alternatives to hospitalization simply do not exist." *In the Interest of J.S.*, 545 N.W.2d 145, 148 (N.D.1996). The "Report Assessing Availability and Appropriateness of Alternate Treatment" in *J.S.* listed "[n]one" under alternatives to hospitalization, and gave as reasons " '[J.S.] denies that he is mentally ill or that he needs any medication,' that J.S. 'is very dangerous and is potentially violent toward others when he is off' medication, and that J.S. 'plainly states that he would not take *any* [medication] if he was out of the hospital.' " *Id.* at 147. In addition, the "Report of Examination" stated:

> [J.S.] continues to refuse to admit that he is mentally ill and will not take medication if it is not court ordered. He has a very serious physical aggressive behavior, when not properly treated while in the community; and this makes him a very difficult patient to get a placement for. He continues to need a structured and supervised arrangement.

*Id.* at 148. This Court found these statements, in addition to the doctor's consistent trial testimony, were sufficient to support the doctor's statement that no alternate treatment was available. *Id.*

[¶ 8] R.F. was examined by three doctors, Dr. Belanger, Dr. Gulkin, and Dr. Peterson, who provided testimony at trial. Dr. Joseph Belanger, a licensed independent practitioner at the State Hospital, testified that a social worker and another doctor had stated three reasons why they would not be able to find alternative treatment for R.F.: the level of symptomatology, fluctuating therapeutic alliances, and duration of alternative programs. He testified he was not aware of any appropriate alternative treatment. When asked whether any alternative facilities had been looked at, he replied, "I know that the social worker has looked at them. She did not give me the list of the ones she contacted this morning so I can't list them by name ..." His testimony did not identify any specific alternative treatments, but he did say R.F. would not meet the criteria to qualify for an alternative treatment.

[¶ 9] Dr. Robert Gulkin, who was appointed to conduct an independent examination of R.F., testified, "I know of no less restrictive alternative treatment program . . . it's not clear to me that a less restrictive treatment program is appropriate at this time. There may be other appropriate programs but I believe we're looking at locked residential units." He also did not identify any specific alternative treatments.

[¶ 10] Dr. Peter Peterson also conducted an independent examination of R.F. Dr. Peterson's report and testimony indicate he believes R.F. is making little to no progress in her current treatment partly because of her hostile feelings toward staff and other patients. He stated alternate treatments should be evaluated as R.F. may be more successful in a different environment. He indicated she needs to be treated in a "very highly structured, secure residential treatment program" or "other hospital-based treatment programs for severe [o]bsessive-compulsive disorder." Dr. Peterson testified R.F. required treatment in the same conditions as the State Hospital, just with "[a] different environment, a different staff."

[¶ 11] When asked on cross-examination if he was aware of any other facilities that could treat R.F., Dr. Peterson replied, "[w]ell, I am aware of—of the Rogers Institute, which is an institute in Wisconsin. I have had other patients go there. The question is if that facility would accept her given her problems." Dr. Peterson was asked if he was aware of any other facilities, and he answered, "I'm not aware of any. I can say there may be psychiatric group homes, I don't know where they would be, that would be able to handle a person like her with the use of a wander guard."

[¶ 12] R.F. testified as well, and submitted into evidence informative literature about Rogers Memorial Hospital. The State recalled Dr. Belanger after he had reviewed the information during a break. Dr. Belanger testified R.F. did not meet the minimum entry level criteria for Rogers Memorial Hospital, he did not think she would be able to function under the strict schedule, and treatment would cost approximately $20,000 per month, while treatment at the State Hospital was costing "a little bit less than $10,000 a month." He stated the program at Rogers Memorial Hospital would be "too hard, too demanding, too painful."

[¶ 13] The trial court found:

I find a treatment program other than hospitalization would not be adequate to meet her needs or be sufficient to prevent harm or injury to herself, and if she's not hospitalized once again she would be at risk for danger to herself due to her inability to care for herself.

. . .

As to the Rogers Institute, as was brought out here today, the Rogers Hospital, rather, it was brought out that that is an—is not a public institution that takes Court Ordered patients and I think that our statutes apply to such a situation. . . .

I certainly believe that the hospital and the guardian would make the best efforts, and I would expect them to put [R.F.] in contact with another hospital, but it appears at this time that Rogers would be a less restrictive—or I shouldn't say less restrictive, but it appears from what I've heard here today she would not meet their criteria at this time. If in the future should she meet that criteria the Court would encourage both the hospital and the guardian to explore that alternative with the understanding that would probably take some type of involvement with the State as well about the cost. . . .

[¶ 14] Dr. Owen's report and the trial testimony was sufficient to support the

court's finding that no alternative treatment is available. The court's decision is not clearly erroneous. We affirm.

### III.

[¶ 15] R.F., in her closing argument, asked the district court to require the State Hospital to contact Rogers Memorial Hospital to determine if she would qualify for the program. She argues the district court erred in not issuing this mandate.

[¶ 16] Section 25–03.1–21(1), N.D.C.C., requires the State Hospital to prepare a report analyzing "treatment programs other than hospitalization." Dr. Owens and three doctors who testified at trial all concluded R.F. requires hospitalization. North Dakota only has one hospital. Rogers Memorial Hospital may be able to provide the treatment R.F. requires, but it would still be hospitalization, not a "treatment program[] other than hospitalization." Nothing in the law requires the State Hospital to look outside this state for treatment options. We are unwilling to say the State Hospital needs to look around the entire country before satisfying itself that hospitalization is the least restrictive treatment available.

[¶ 17] The State Hospital does not have a statutory obligation to assess and review hospitals in other states, and the district court did not err in not requiring such review.

### IV.

[¶ 18] We affirm the continuing treatment order.

[¶ 19] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, and MARY MUEHLEN MARING, JJ., concur.