2005 ND 219
In the Interest of M.M.
William Pryatel, M.D., North Dakota State Hospital, Petitioner and Appellee
v.
M.M., Respondent and Appellant.
No. 20050399
Supreme Court of North Dakota.
Decided December 20, 2005
Jay A. Schmitz, State's Attorney, 511 2nd Avenue S.E., Jamestown, ND 58401, for petitioner and appellee.
Jodie Koch Scherr, P.O. Box 356, Valley City, ND 58072-0356, for respondent and appellant.
Opinion of the Court by VandeWalle, Chief Justice.
VandeWalle, Chief Justice.
[¶1] M.M. appealed a district court order requiring him to be hospitalized at the North Dakota State Hospital for a period not to exceed 45 days and an order authorizing the state hospital to treat him involuntarily with medication. We affirm.

I
[¶2] M.M., a 55-year-old male, has been diagnosed with a "psychotic disorder not otherwise specified." M.M. was admitted to Trinity Hospital in Minot, North Dakota after he was unable to urinate. Doctors at Trinity determined kidney stones were the cause of M.M.'s inability to urinate. M.M. refused surgery to have the kidney stones removed.
[¶3] Trinity hospital staff found M.M. was displaying grandiose delusions. M.M. told Trinity hospital staff he speaks numerous languages, his brothers include George Bush and President Clinton, he has a son who is a general in charge of all the missiles, and M.M. gets information beamed to him from the offshore military missiles. M.M. also made odd statements saying he was red, green, and orange. A psychiatric consultant filed a Petition for Involuntary Commitment based on statements made by M.M. that were termed delusional and psychotic. M.M. was sent to the state hospital.
[¶4] M.M. did not undergo surgery for the kidney stones. M.M.'s condition was treated without surgery and he is able to urinate.
[¶5] Upon entering the state hospital, M.M. told Dr. Pryatel he was a grey ghost, involved with military intelligence, and a stunt man. M.M. claimed he was Jackie Gleason's kid on television, that Lee Majors is M.M.'s stunt coordinator, and that M.M. was in China for an e-coli break out.
[¶6] Dr. Pryatel testified the state hospital believes M.M. is homeless, panhandles for money, and tries to hitchhike around the United States. At the state hospital, M.M. has been feeding himself and maintaining his own personal hygiene. Dr. Pryatel testified M.M.'s kidney stone condition presents a potential serious health risk that will come back and harm M.M. if it goes untreated. Dr. Pryatel testified there are no other treatment options that are available or appropriate for M.M.'s condition. Dr. Pryatel testified he doesn't believe M.M. is able to maintain himself in society, he doesn't believe M.M. would "last long" in a homeless shelter because of the types of statements he makes, and he doesn't believe M.M. is able to manage his medical problems.
[¶7] M.M. testified he does not think medication is necessary and he was doing fine on his own. M.M. testified he refused surgery because he did not have any prior problems, he thought he should think about it, he could go to another hospital if necessary, and he did not think his condition was life-threatening. M.M. testified he was in North Dakota trying to get a job but testified he would leave North Dakota if released from the state hospital. M.M. testified he has not had any thoughts of hurting himself or others and he has never been diagnosed with mental illness in the past. M.M. testified any statements he made that sounded delusional were made because he was in extreme pain. He testified he is not George Bush or Bill Clinton's brother, he has done stunts, and he can speak Chinese and Russian. He also testified he believes he has a son in the military but he is somewhere in the Middle East. M.M. also testified he was a U-operator in 1971 and is familiar with "SAT operations and city SAT operations and U-operations, state, federal, ships." M.M. also testified he has never been shown any proof, such as x-rays, of the kidney stones.
[¶8] The trial court found M.M. was delusional based on the delusional statements M.M. made. The trial court found M.M. was a person requiring treatment because M.M. had a medical condition that was potentially life-threatening if left untreated and M.M.'s mental health precluded him from making a rational decision on medical treatment. The trial court found hospitalization and medication was the least restrictive alternative treatment because M.M. did not have a home where he could be sent to be treated. The trial court ordered M.M. to be hospitalized at the state hospital for 45 days where he would be treated with medication, involuntarily if necessary, for his mental illness. M.M. argues he is not mentally ill, he is not a person requiring treatment, and involuntary hospitalization and treatment with medication is not the least restrictive alternative treatment.

II
[¶9] "Before the trial court can issue an involuntary treatment order, the petitioner must prove by clear and convincing evidence that the respondent is a person requiring treatment." Interest of D.Z., 2002 ND 132, ¶ 6, 649 N.W.2d 231; N.D.C.C. § 25-03.1-20; N.D.C.C. § 25-03.1-07. To prove that the respondent is a person requiring treatment, as defined under N.D.C.C. § 25-03.1-02(12), "the petitioner must prove by clear and convincing evidence the person is mentally ill and there is a reasonable expectation that, if the person is not treated, he poses a serious risk of harm to himself, others, or property." Interest of D.Z., 2002 ND 132, ¶ 6, 649 N.W.2d 231. "The trial court's decision must be based upon clear and convincing evidence, while this Court reviews the trial court's findings under a more probing clearly erroneous standard of review." Id. at ¶ 6. Under this more probing standard, "we will affirm an order for involuntary treatment unless it is induced by an erroneous view of the law or if we are firmly convinced it is not supported by clear and convincing evidence." See Interest of P.B., 2005 ND 201, ¶ 5 (quoting Interest of J.S., 530 N.W.2d 331, 333 (N.D. 1995)).
[¶10] The trial court's decision was not induced by a clearly erroneous view of the law. There is ample evidence in the record showing M.M. is suffering from mental illness. Throughout the course of his treatment at Trinity and the state hospital, M.M. has made multiple statements leading doctors to conclude he is suffering from mental illness. At the involuntary treatment hearing, Dr. Pryatel testified it is his opinion M.M. is mentally ill. Dr. Pryatel testified M.M.'s speech was rambling and disorganized and M.M. displayed signs of paranoid type schizophrenia but Dr. Pryatel does not have enough history at this point to determine if M.M. is schizophrenic. There is evidence to support the trial court's findings even though M.M. may have appeared rational when testifying at the involuntary treatment hearing.
[¶11] M.M. argues he is not a person requiring treatment because he does not pose a serious risk of harm to himself, others, or property. At the involuntary treatment hearing, Dr. Pryatel testified M.M. refused doctors' recommendations to surgically treat his kidney stones, which would be the proper treatment for such a condition. Expert medical testimony provides that M.M.'s kidney condition will eventually result in renal failure or other life-threatening conditions if left untreated. Although a person has a right to refuse medical treatment the decision to refuse that treatment should be made when the person is not mentally ill. Because of his mental illness, M.M. is not able to make a rational decision regarding treatment of his kidney condition and poses a serious risk of harm to himself if a rational treatment decision cannot be made. "When one or more reasonable inferences can be drawn from credible evidence, this Court must accept the inferences drawn by the trial court." Interest of D.Z., 2002 ND 132, ¶ 9, 649 N.W.2d 231. The trial court found the specific risk, if M.M. were not hospitalized and treated, was that M.M.'s kidney condition would eventually lead to renal failure or other life-threatening conditions. We conclude the trial court's findings that M.M. is a mentally ill person who is in need of treatment and who presents a danger to himself are not clearly erroneous.

III
[¶12] M.M. argues the trial court erred in ordering involuntary commitment and involuntary treatment with medication rather than some less restrictive alternative treatment. "When an individual is found to be a person requiring treatment he has the right to the least restrictive conditions necessary to achieve the purposes of the treatment." Interest of D.Z., 2002 ND 132, ¶ 10, 649 N.W.2d 231. "The court must make a two-part inquiry: (1) whether a treatment program other than hospitalization is adequate to meet the individual's treatment needs; and (2) whether an alternative treatment program is sufficient to prevent harm or injuries which the individual may inflict upon himself or others." Id. at ¶ 10. "The court must find by clear and convincing evidence that alternative treatment is not adequate or hospitalization is the least restrictive alternative." Id. at ¶ 10. "This Court will not set aside the trial court's findings unless they are clearly erroneous." Id. at ¶ 10.
[¶13] In response to the question by counsel for the state hospital asking "[i]s there any other treatment for [M.M.'s] condition that is clinically available or appropriate," Dr. Pryatel testified hospitalization and medication were the only effective treatment for such a condition. Dr. Pryatel testified the medication prescribed is effective in treating symptoms similar to those exhibited by M.M. and psychotherapy and group therapy do not work in treating these symptoms. Since M.M. was homeless and a transient, no outpatient or independent living arrangements were available to treat M.M. and involuntarily committing him to the state hospital was the only option available to administer his treatment. M.M. testified if he were released from the state hospital he would leave North Dakota. M.M. has also refused medication and treatment. The trial court found an alternate program is not presently available or adequate to meet M.M.'s needs for treatment to prevent harm to himself and we conclude the trial court's finding is not clearly erroneous.

IV
[¶14] M.M. argues the trial court erred in ordering him to be treated involuntarily with medications. Dr. Pryatel requested authorization to treat M.M. with a number of different medications. Dr. Pryatel testified he does not seek to use all of these medications simultaneously, but to administer them only as necessary to effectively treat M.M.'s condition. Dr. Pryatel testified before they treat him involuntarily, they will ask M.M. if he would take any of the suitable medications voluntarily. Dr. Pryatel also testified they would attempt to give M.M. the medications orally before thinking about using injectable forms. Dr. Pryatel testified it is his opinion M.M.'s mental health would substantially benefit from treatment with medication.
[¶15] For the trial court to authorize treatment with prescribed medication, the treating psychiatrist and another licensed physician must certify, and the court must find by clear and convincing evidence, the following factors under N.D.C.C. § 25-03.1-18.1:
1. a. Upon notice and hearing, a treating psychiatrist may request authorization from the court to treat a person under a mental health treatment order with prescribed medication. The request may be considered by the court in an involuntary treatment hearing. As a part of the request, the treating psychiatrist and another licensed physician or psychiatrist not involved in the current diagnosis or treatment of the patient shall certify:
(1) That the proposed prescribed medication is clinically appropriate and necessary to effectively treat the patient and that the patient is a person requiring treatment;
(2) That the patient was offered that treatment and refused it or that the patient lacks the capacity to make or communicate a responsible decision about that treatment;
(3) That prescribed medication is the least restrictive form of intervention necessary to meet the treatment needs of the patient; and
(4) That the benefits of the treatment outweigh the known risks to the patient.
[¶16] There is record evidence to support the existence of each of these factors. Dr. Pryatel testified the medications requested are clinically appropriate to treat M.M.'s condition and without them M.M. poses a serious risk of harm to himself, M.M. was offered and refused treatment with these medications, these medications are the least restrictive form of intervention necessary to treat M.M., and the benefits of this treatment outweigh the risks to M.M. The trial court found the statutory factors were proven by clear and convincing evidence, and we conclude the trial court's finding is not clearly erroneous.

V
[¶17] For the reasons stated, we affirm the trial court's order finding M.M. is a mentally ill person requiring commitment at the state hospital for a period not to exceed 45 days, and we also affirm the court's order authorizing prescribed medication for treatment of M.M.'s condition.
[¶18] Gerald W. VandeWalle, C.J.
Dale V. Sandstrom
Mary Muehlen Maring
Kapsner, Justice, dissenting.
[¶19] The district court's finding that M.M. is delusional and therefore mentally ill, as defined by N.D.C.C. § 25-03.1-02(11), was not clearly erroneous. But mental illness alone is not enough for the involuntary commitment of a "person requiring treatment" under N.D.C.C. § 25-03.1-02(12). The person must also present a "serious risk of harm to that person, others, or property." Id.
[¶20] The district court's finding that M.M. was a "serious risk of harm" was based on M.M.'s refusal to submit to surgery for kidney stones. This is shaky ground on which to place such a finding. While kidney stones are undoubtedly painful and can lead to serious health complications, even death, refusing surgery is not an entirely unreasonable decision.
[¶21] A mentally ill person may risk his health by not submitting to surgery, but so could a mentally healthy person for fear of surgery, for religious reasons, because a mentally healthy person does not believe the possible benefits are worth the risk, or any number of other rational reasons. The United States Supreme Court has recognized that a "competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990). However, the Cruzan court warned that an incompetent person is not able to make an informed and voluntary choice to exercise a right to refuse treatment. Id. at 280.
[¶22] Further complicating this situation, the state's psychiatrist has sought and obtained an order to involuntarily medicate M.M. At hearing, M.M. had not yet been medicated because he had refused the offered medications. Despite M.M.'s not having been medicated, Dr. Pryatel testified that M.M. was performing his daily living activities in the hospital and was not engaging in any behaviors threatening to himself or others. M.M. testified at the hearing. He was responsive to questions asked and the judge found "that when he testified he didn't appear to be delusional."
[¶23] He was asked about his decision to refuse the kidney stone operation and responded:
Q. Okay. When you got sick with the kidney stones, did you refuse treatment?
A. No. They asked me if I wanted to have an operation, and I thought the logical thing to do would be to think about it because I didn't have any prior soreness. It just hit me. I just couldn't urinate. So I thought the hospital's not going anywhere, why don't I walk around the block and think about it. There's other hospitals, there's other destinations. I didn't think it was a life-threatening situation. They told me that because I made that decision that I was mentally ill.
[¶24] Despite the unproblematic behavior at the state hospital and during the hearing, the psychiatrist testified that he wanted to medicate M.M. in the hospital and at the end of that period would accept the same refusal of treatment from M.M.
Q. Would it be grounds to believe that he was mentally ill, the simple fact that he refused treatment for a serious medical condition?
A. Well, if he was, quote, unquote, sane, and carried on a rational coherent conversation with him and he just says for whatever reason I don't want treatment for this now, or I want to go down someplace and get treatment elsewhere or something, then we probably would let him go. But the fact that he's so impaired with his mental state that I don't think he's making a rational coherent decision in regards to this.
Q. To follow up, so what you're saying is is you're not sure that because of the mental condition that he understands the physical problem?
A. Correct.
Q. And is making an informed or at least coherent choice not to treat the medical problem?
A. Correct.
Q. The second problem being that if he is treated for 90 days and then shows good improvement and is ready for release, he can elect to take off. What would we do with him, I mean where would we place him?
. . . .
Q. So what you're saying is, is that if he made that choice after you thought he was suitable for outpatient, that's a risk you have to take?
A. Correct.
Q. But at this point you don't think it's a risk you're willing to take?
A. Correct.
[¶25] I appreciate the doctor's concern for M.M.'s ability to assess his condition particularly because at the time M.M. originally refused the surgery M.M. was exhibiting delusional behavior. However, M.M. has continued to indicate he does not want surgery and the doctor's concern is not supported by clear and convincing evidence that M.M. presents a serious risk of harm to himself, others, or property as required by N.D.C.C. § 25-03.1-02(12). Therefore, I respectfully dissent. I would reverse the order for involuntary treatment and the medication order.
[¶26] Carol Ronning Kapsner
Daniel J. Crothers