Filed 12/13/06 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2006 ND 253

In the Interest of R.S. 

Allan Weisenburger, FNP-C, Petitioner and Appellee

v.

R.S., Respondent and Appellant

No. 20060318

Appeal from the District Court of Stutsman County, Southeast Judicial District, the Honorable John E. Greenwood, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

Lonnie Olson, State’s Attorney, 524 4th Avenue NE, Unit 16, Devils Lake, ND 58301, for petitioner and appellee.

Thomas E. Merrick, P.O. Box 1900, Jamestown, ND 58402-1900, for respondent and appellant.

Interest of R.S.

No. 20060318

Crothers, Justice.

[¶1] R.S. appealed from an order requiring him to be hospitalized at the North Dakota State Hospital for 90 days and an order allowing him to be treated involuntarily with medication during that 90-day period.  We conclude the district court’s finding that R.S. is a person requiring treatment is not clearly erroneous and affirm.

I

[¶2] R.S., a 48-year-old male, was admitted to the State Hospital in early October 2006 after a law enforcement officer witnessed him behaving erratically.  After his evaluation at the State Hospital, R.S. was diagnosed with psychotic disorder.  A nurse practitioner at the State Hospital filed a petition to have R.S. involuntarily committed for treatment.  Dr. William Pryatel, R.S.’s treating psychiatrist at the State Hospital, also filed a request to involuntarily treat R.S. with medication during his hospitalization.

[¶3] At the involuntary commitment hearing, the district court heard testimony from four witnesses regarding R.S.’s mental health.  Three witnesses were called by the petitioner: Officer Ted Rainesalo, Dr. William Pryatel, and R.S.’s nephew.  R.S. testified on his own behalf.

[¶4] Officer Rainesalo testified regarding the incident at the Devils Lake Police Department in September 2006 which resulted in R.S.’s admission to the State Hospital.  Officer Rainesalo recounted that R.S. entered the police station looking lost, and that he spoke with R.S. for about five minutes, during which it was obvious that R.S. was in some kind of mental distress.  According to Officer Rainesalo, R.S. stated he was having a problem with a lady in a black magic shop out at Fort Totten who was reading his mind and preventing him from sleeping.  After a few minutes, R.S. stopped talking, and the officer told him that he could come back if he needed to talk some more.  About fifteen minutes later, R.S. returned to the police station.  Officer Rainesalo testified he heard the department secretary calling his name.  He looked out the door of his office and saw R.S. approaching.  In the officer’s words, “I was approximately 10 feet from [R.S.], I noticed he was carrying a gun in his left hand down along his left leg.  And I immediately took about three steps and got a hold of the gun and took custody of it and [R.S.].”  The officer testified he felt threatened  even though R.S. did not verbally threaten him or point the gun at anybody.  Officer Rainesalo further testified that when he asked R.S. what he was doing, R.S. replied he was bringing the gun into the police department to “check it out.”  After the officer seized the gun, he discovered it was unloaded, although ammunition was found in R.S.’s vehicle.

[¶5] Dr. Pryatel, R.S.’s treating psychiatrist, also testified at the involuntary commitment hearing.  Dr. Pryatel testified that R.S. minimizes or denies his problems and says that they were just dreams.  He stated that R.S. has been very guarded at the State Hospital and has not cooperated with providing information for psychological testing.  Dr. Pryatel also testified that R.S. was admitted to the State Hospital after having talked about a hit man named Eugene who was trying to get him.  Dr. Pryatel testified about the risk of harm that R.S. presents, stating:

Q.  What risk of harm do you believe he presents?

A.  Well, we have an individual here who reportedly in the community has been feeling there’s a hit man out after him.  We had this bizarre behavior with the gun, with the weapon, and so unmedicated this type of thing tends to spiral and get worse and worse and so, you know, I think it could lead to an event.

Q.  Is that based on the characteristics of this diagnosis [psychotic disorder] that it tends to go in that direction?

A.  If not interrupted it tends to get worse.

. . . .

Q.  And per your previous testimony you believe without the treatment that there’s a spiral that could go on here that would lead to a risk of harm to others in the future.

A.  These disorders don’t tend to get better on their own, if anything they tend to get worse and worse and so we’ve been warned.

Q.  So you believe that the presence of the gun is a significant indicator of future dangerousness?

A.  Making statements that he feels a hit man is out after him and has a weapon here so . . .

. . . .

Q.  And it appears you have no past treatment history that you could make any predictions based on with [R.S.]?

A.  We don’t have any history with him, I’m just going by what our experience has been in the past and also, you know, psychiatry.

Q.  Clinical experience?

A.  Clinical experience and psychiatry in general.

[¶6] Dr. Pryatel was asked about the significance of R.S.’s possession of the gun, and explained:

My hypothesis is that he needed the gun because he was being stalked, that there was a hit man after him and—and you have to remember he shows up at the police station the first time and didn’t say anything and kind of wanders around and stuff and then came back again with the gun.  So maybe there was enough sense with him to not actually use the weapon, you know, some part of him told him he needed to get to the police station and everything is not all right here and so on as opposed to taking things in his own hands, taking matters into his own hands. 

[¶7] R.S.’s adult nephew also testified, stating R.S. is self-sufficient and lives alone in an apartment, and that R.S. has been a full-time employee on a park board maintenance staff for about fifteen years.  However, the nephew testified he was concerned because R.S. has exhibited increasing levels of paranoia.  According to the  nephew, R.S. does not want to leave his house because he thinks “there’s always  people, someone out to get him or a sniper, even at work.”  The nephew occasionally accompanied R.S. at work and testified R.S. “would be looking around thinking there was a sniper out there or somebody ready to take him out.”  R.S. also verbalized his fears that family members and anyone else who tried to help R.S. were “out to get him.”

[¶8] On a driving trip last summer, R.S. was grabbing the door and getting ready to jump out of the moving vehicle because he thought that his nephew and other relatives were going to throw him into a Utah salt mine.  The nephew also recounted that R.S. would hear his name over a police scanner when it was not there and that R.S. thought there were microphones planted in his house.  Despite these bizarre incidents, the nephew stated twice that he did not think R.S. would harm himself or anyone else because R.S. tends to lock himself up or isolate himself.

[¶9] R.S. also testified at the commitment hearing.  With regard to the incident at the police station, R.S. testified that he brought the gun into the station to check if it was stolen.  According to R.S., he purchased the gun from a person on the street “three, four, five years” ago.  Although R.S. admitted telling Officer Rainesalo about a black magic shop, he denied that he ever told the officer about a lady at Fort Totten reading his mind.  When he was questioned about several different alleged delusions, R.S. stated that they were dreams.  R.S. denied that he thinks other people, including family members, are out to get him, or that he ever thought his relatives were going to throw him into a salt mine.  He also denied the incidents related by his nephew involving the police scanner and microphones planted in his home.

[¶10] After hearing this evidence, the district court made findings on the record.  The district court stated:

I find the evidence is clear and convincing to indicate that the respondent is mentally ill.  The diagnosis at this time is Psychotic Disorder, though Dr. Pryatel indicates that is a preliminary diagnosis.  The symptoms however are present.  The symptoms are that he recently went into the police department in Devils Lake speaking about a black magic shop, that somebody was reading his mind, indicated he was unable to sleep.  He left the police department, came back a short time later carrying a pistol.  He has a history of paranoia as testified to by [his nephew].  Claims that people are after him to the point where he doesn’t leave his home.  He believes that there’s snipers out there to get him.  He has locked himself in, he doesn’t answer his phone or his door.  He thinks there are microphones in his house.  People are going to come and get him.  And on a recent trip to Utah he almost–or he thought that there were–that people were going to throw him into a salt mine to the point where his nephew feared that he would jump out of the moving vehicle.

I do find that if the respondent is not treated there does exist a serious risk of harm to others and a substantially [sic] likelihood of inflicting serious bodily injury, he did this during an episode of his paranoia and delusional behavior, he did carry a weapon into the police department and that’s sufficient for the Court to believe that there is a substantial risk of or a substantial risk of harm to others.

I find that a treatment program other than hospitalization would not be adequate to meet his needs or be sufficient to prevent harm or injuries to others, if he is not hospitalized there is a risk of personal injury to other persons acting out on his paranoia.  I conclude that he is mentally ill and is a person who requires treatment and order that he undergo treatment at the North Dakota State Hospital for a period not to exceed 90 days.  

The district court issued an Order for Hospitalization and Treatment based on these findings.  Additionally, the district court issued an Order to Treat with Medication, permitting the State Hospital to involuntarily medicate R.S. with certain medications during the 90-day commitment period.

[¶11] On November 1, 2006, the same day that the district court issued these orders, R.S. moved for an order staying the execution of the Order to Treat with Medication pending appeal to this Court.  The district court granted R.S.’s motion and stayed the involuntary medication order for 30 days.  On November 17, 2006, R.S. filed a motion in this Court requesting an extension of the stay, and we issued an order staying the Order to Treat with Medication until R.S.’s appeal is resolved.

II

[¶12] Our review of an involuntary treatment order under N.D.C.C. ch. 25-03.1 is limited to a review of the procedures, findings, and conclusions of the district court.  
Interest of L.D.
, 2003 ND 182, ¶ 5, 671 N.W.2d 791.  The district court’s order for involuntary treatment must be based upon clear and convincing evidence.  
Interest of M.M.
, 2005 ND 219, ¶ 9, 707 N.W.2d 78.  We review the findings of the district court under a more probing clearly erroneous standard of review.  
Id.
  A finding is clearly erroneous if it is induced by an erroneous view of the law, or if this Court has a definite and firm conviction, based on all the evidence, that it is not supported by clear and convincing evidence.  
Interest of C.H.
, 2005 ND 130, ¶ 4, 699 N.W.2d 849; 
Interest of L.D.
, at ¶ 5.

III

[¶13] R.S. argues that the district court’s finding that he is a person requiring treatment is clearly erroneous because the district court’s finding that he poses a serious risk of harm to others is not supported by clear and convincing evidence.

[¶14] Before the district court may issue an involuntary treatment order, the petitioner must prove by clear and convincing evidence that the respondent is a “person requiring treatment” under N.D.C.C. § 25-03.1-02(12).  
Interest of M.M.
, 2005 ND 219, ¶ 9, 707 N.W.2d 78.  Section 25-03.1-02(12) provides:

“Person requiring treatment” means a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property.  “Serious risk of harm” means a substantial likelihood of:

a. Suicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;

c. Substantial deterioration in physical health, or substantial injury, disease, or death, based upon recent poor self-control or judgment in providing one’s shelter, nutrition, or personal care; or

d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon evidence of objective facts to establish the loss of cognitive or volitional control over the person’s thoughts or actions or based upon acts, threats, or patterns in the person’s treatment history, current condition, and other relevant factors, including the effect of the person’s mental condition on the person’s ability to consent.

Therefore, a two-step process is used to determine whether someone is a “person requiring treatment.”  
Interest of C.H.
, 2005 ND 130, ¶ 6, 699 N.W.2d 849.  First, the district court must find that the person is mentally ill.  
Id.
  Second, the district court must find that there is a reasonable expectation that if the person is not treated, there exists a “serious risk of harm” to himself, others, or property, as defined by the statute.  
Id.

[¶15] There is a presumption against treatment.  
Interest of I.K.
, 2003 ND 101, ¶ 15, 663 N.W.2d 197.  It is not enough that a person would benefit from treatment; the person must require treatment.  
Interest of L.D.
, 2003 ND 182, ¶ 5, 671 N.W.2d 791.  To establish that a mentally ill person requires treatment, there must be convincing evidence that the person poses a serious risk of harm if left untreated.  
Interest of I.K.
, at ¶ 17.  Direct evidence of overt violence or an expressed intent to commit violence is not required to find that a person poses a serious risk of harm.  
Interest of D.Z.
, 2002 ND 132, ¶ 9, 649 N.W.2d 231.  This Court has rejected the argument that the “serious risk of harm” requirement must be proven with evidence of an overt violent act or expressed intent to commit violence.  
In the Interest of D.P.
, 2001 ND 203, ¶ 9, 636 N.W.2d 921.  Rather, “[w]hen one or more reasonable inferences can be drawn from credible evidence, this Court must accept the inferences drawn by the district court.”  
Id.
 (citing 
In the Interest of M.S.
, 1999 ND 117, ¶ 8, 594 N.W.2d 924).

[¶16] Here, R.S. does not challenge the finding he is mentally ill.  Rather, R.S. contests the district court’s finding that he poses a serious risk of harm to others if he is not treated.  In its findings, the district court focused on the substantial likelihood that R.S. would inflict serious bodily injury on others.  Specifically, the district court found that the incident at the police department was sufficient evidence that R.S. poses a serious risk of harm to others.  The district court did not make any findings regarding whether R.S. poses a serious risk of harm to himself or whether R.S.’s mental health has substantially deteriorated.

[¶17] Based on the evidence before the district court, we conclude the district court  was not clearly erroneous when it found R.S. poses a serious risk of harm to others if left untreated.  Dr. Pryatel testified that R.S.’s mental illness will likely get progressively worse and that it will not improve without medication.  R.S.’s nephew confirmed that R.S.’s mental illness is getting worse, and that he has urged R.S. to seek treatment.  The district court also had before it both direct evidence and evidence upon which reasonable inferences could be drawn that R.S. posed a serious risk of harm to others.  The evidence included the facts that R.S. owned a handgun and ammunition, and that R.S. was armed with the gun when he walked directly into a police station without stopping at the front reception desk.  The incident involving the gun at the police station would be sufficient to cause alarm in any event.  But here, reason for concern is amplified by R.S.’s routine fears that snipers are hunting him and that relatives and others who are trying to help R.S. are “out to get him.” Evidence before the district court also was that R.S. hears voices in his head, wrongly believes microphones have been planted in his home, imagines he hears his name on a police scanner, and becomes so fearful that he refuses to answer the telephone, answer the door or leave his home.  In Dr. Pryatel’s words, “[t]hese disorders don’t tend to get better on their own, if anything they tend to get worse and worse and so we’ve been warned.”

IV

[¶18] North Dakota law allows a court to act on warnings and does not require actual violence or expressed threats.  
Interest of D.Z.
, 2002 ND 132, ¶ 9, 649 N.W.2d 231.  On review, we conclude the district court did what is permitted by law and relied on direct evidence and reasonable inferences to find R.S. is a person requiring treatment.  We therefore affirm, concluding the district court’s orders were supported by clear and convincing evidence.

[¶19] Daniel J. Crothers

Dale V. Sandstrom

Mary Muehlen Maring

VandeWalle, Chief Justice, dissenting.

[¶20] I respectfully dissent.  The district court’s finding that R.S. is a person requiring treatment is clearly erroneous because there is no clear and convincing evidence supporting the finding that R.S. poses a serious risk of harm to others if he is not treated.

[¶21] To establish that a mentally ill person requires treatment, convincing evidence must be presented to show that if left untreated, the person poses a serious risk of harm to himself, others, or property.  
Interest of I.K.
, 2003 ND 101, ¶ 17, 663 N.W.2d 197.  Section 25-03.1-02(12), N.D.C.C., provides a detailed definition of what constitutes “serious risk of harm,” including a substantial likelihood of “[k]illing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats.”  In this case, the district court found that a serious risk of harm exists because there is a substantial likelihood that R.S. will inflict serious bodily injury on others.  However, the evidence presented at the commitment hearing does not provide clear and convincing support for this finding.

[¶22] R.S. has lived alone for many years and is self-sufficient.  He has held a full-

time position as a maintenance worker for about fifteen years.  He does not have a history of violent or threatening behavior.  At the commitment hearing, Dr. Pryatel testified that R.S. stays to himself at the State Hospital and has not had any confrontations or caused any problems there, even without medication.  R.S.’s nephew testified that he does not think R.S. would harm himself or anyone else.

[¶23] In support of its finding that R.S. poses a serious risk of harm to others, the district court relied primarily on the incident where R.S. carried a gun into the police department.  However, this incident, when viewed in light of all the circumstances, is not convincing evidence of a substantial likelihood that R.S. will inflict serious bodily harm on another person if he is not treated.  Officer Rainesalo had invited R.S. to return to the police station if he needed to talk just fifteen minutes before the incident.  Although Officer Rainesalo testified that he felt threatened by the gun that R.S. carried into the station, R.S. did not exhibit any accompanying violent or threatening behavior.  Indeed, Officer Rainesalo testified that R.S. walked slowly past the front desk, held the gun down along his side, and never made verbal threats or pointed the gun at anyone.  After Officer Rainesalo seized the gun, he discovered that it was unloaded, which was consistent with R.S.’s claim that he brought the gun to the police station to check whether it was stolen.

[¶24] Furthermore, Dr. Pryatel’s expert testimony was not clear and convincing evidence that R.S. poses a serious risk of harm to others if not treated.  His testimony did not establish a substantial likelihood that R.S. will inflict serious bodily harm on others, which was the district court’s finding.  Dr. Pryatel testified only that without medication, psychotic disorder “tends to spiral and get worse and worse” which “could lead to an event.”  Dr. Pryatel gave a vague answer when he was asked whether the incident with the gun is a significant indicator of future dangerousness.  The doctor responded, “Making statements that he feels a hit man is out after him and has a weapon here so . . . .”  In his testimony, Dr. Pryatel relied primarily on the general characteristics of psychotic disorder and not the particular facts of R.S.’s case.  “Clinical experience and  psychiatry in general” may establish a profile of a person who might reasonably be expected to be a danger to others, but I am not persuaded that a profile, without more, constitutes the clear and convincing evidence which is statutorily necessary to conclude that R.S. is a person requiring treatment.

[¶25] In this case, it is clear that R.S. would benefit from mental health treatment.  He suffers from delusions and paranoia.  However, this is not the standard.  There must be clear and convincing evidence that R.S. is a “person requiring treatment” under N.D.C.C. § 25-03.1-02(12).  Although this Court has held that direct evidence of overt violence or an expressed intent to commit violence is not required to find that a person poses a “serious risk of harm,” the statute does require clear and convincing evidence of a substantial likelihood that R.S. will inflict serious bodily harm on another person “as manifested by acts or threats.”  N.D.C.C. § 25-03.1-02(12); 
Interest of D.Z.
, 2002 ND 132, ¶ 9, 649 N.W.2d 231.  Based on the entire record, there is no clear and convincing evidence that R.S. poses a serious risk of harm to others if left untreated.

[¶26] I would reverse the district court’s Order for Hospitalization and Treatment.

[¶27] Gerald W. VandeWalle, C.J.

Carol Ronning Kapsner