In the Interest of L.B., Respondent and Appellant.

Civ. No. 890390.

Supreme Court of North Dakota.

March 1, 1990.

Richard Gilman Carver, Bismarck, for respondent and appellant.

Bruce B. Haskell, Asst. States Atty., Bismarck, for petitioner and appellee.

GIERKE, Justice.

L.B. appeals from an order of the County Court of Burleigh County requiring that he be hospitalized and treated for mental illness and chemical dependency for a period not to exceed two weeks and, subsequent to the hospitalization, that he be admitted to alternative outpatient treatment for a period not to exceed 76 days. We affirm the county court's order.

On November 22, 1989, a petition for involuntary commitment was filed against L.B. A preliminary hearing was waived by the parties and the involuntary commitment hearing was held on November 29, 1989. At the commitment hearing, the county court found L.B. to be a mentally ill person, pursuant to Section 25–03.1–02(9),

N.D.C.C., who required treatment pursuant to Section 25–03.1–02(10), N.D.C.C. The county court held, among other things, that L.B. lacked contact with reality, had a history of violence or aggression when he consumed alcohol, and had no insight into his need for treatment. The court concluded that if L.B. was not treated there existed a serious risk of harm to others together with a serious risk of substantial deterioration of L.B.'s physical and mental health. The court ordered L.B. hospitalized for a period not to exceed two weeks with alternative treatment to follow the hospitalization for a period not to exceed 76 days.

L.B. filed an expedited appeal to this Court from the county court's November 29, 1989, order for involuntary commitment. The two issues before us on this appeal are: (1) whether the county court's determination that L.B. was mentally ill and required treatment was supported by clear and convincing evidence; and (2) whether Section 25–03.1–21(1) of the North Dakota Century Code which requires a listing of alternative treatment options was complied with.

Sections 25–03.1–02(9) and 25–03.1–02(10), N.D.C.C., respectively provide:

"9. 'Mentally ill person' means an individual with an organic, mental, or emotional disorder which substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations. 'Mentally ill person' does not include a mentally retarded or mentally deficient person of significantly subaverage general intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior. Chemical dependency does not per se constitute mental illness, although persons suffering from that condition may also be suffering from mental illness.

"10. 'Person requiring treatment' means a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or

property. 'Serious risk of harm' means a substantial likelihood of:

a. Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;

c. Substantial deterioration in physical health, or substantial injury, disease, or death based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or

d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors."

In essence, the determination that an individual is a person requiring treatment under the statutory definition is a two-step process. Initially, the court must find that the individual is "mentally ill" and secondly, the court must conclude that "there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property." Section 25–03.1–02(10), N.D.C.C. While there exists a presumption in favor of the respondent that he or she does not require treatment, a court can order the involuntary treatment of a respondent if the petitioner proves by clear and convincing evidence that the respondent is a person requiring treatment. Section 25–03.1–19, N.D.C.C.

 The scope of this Court's review of an involuntary commitment order is limited to a review of procedures, findings, and conclusions of the lower court. *In re Riedel*, 353 N.W.2d 773, 775 (N.D.1984). Under Rule 52(a), N.D.R.Civ.P., the trial court's determination of whether or not there is clear and convincing evidence that the respondent is a person in need of treat-

ment is a finding of fact which will not be set aside on appeal unless is it clearly erroneous. *Kottke v. U.A.M.*, 446 N.W.2d 23, 26 (N.D.1989). A finding of fact is clearly erroneous when, although there may be some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *State v. Morrison*, 447 N.W.2d 272, 275 (N.D.1989). In this case, we are not left with a firm conviction that a mistake has been made.

 In this case, Dr. Therese S. Park, a psychiatrist at the North Dakota State Hospital, filed a petition to have L.B. admitted for treatment. She testified that she had been L.B.'s attending psychiatrist for approximately a month prior to the treatment hearing and had seen L.B. on a daily basis except on weekends. Dr. Park stated that, in her professional opinion, L.B. was chemically dependent on alcohol as well as being mentally ill. Dr. Park testified that L.B. lacked insight and judgment as a result of brain damage. Further, she found that L.B. suffered from a passive aggressive personality disorder meaning that he could not control his temper and hostility under certain circumstances. She felt that if L.B. was allowed to live independently without supervision it would be doubtful that he would continue taking his medication. While Dr. Park did not recommend continued hospitalization for L.B., she strongly recommended the placement of L.B. in an alternative treatment facility where he would be under supervised care. However, due to the unavailability of an immediate opening in an alternative treatment facility as of the date of the treatment hearing, Dr. Park stated that L.B. should remain in the hospital until such a facility could be found for him.[1]

Dr. James Parker, a clinical psychologist at the Jamestown State Hospital, testified on behalf of L.B. He stated that prior to the treatment hearing, he had personal contact with L.B. on two occasions. Based on his personal observations and extensive

---

**1.** Apparently, such a facility had been found for L.B. as his counsel indicated during oral arguments that L.B. had been released from the hospital to voluntarily undergo some type of treatment at an alternative treatment center pending the decision of this Court.

psychological tests given to L.B., Dr. Parker testified that particular regions of L.B.'s brain were moderately impaired such that L.B. could not modulate his impulses as efficiently as he should be able to. Dr. Parker found that L.B. lacked insight into his problems and didn't seem to appreciate the concern about his past behavior.[2] Despite the fact that Dr. Parker stated that he didn't believe that L.B. currently suffered from "mental illness" or "chemical dependency", Dr. Parker recommended that L.B. be placed in a semi-structural environment such as a group home or transitional living home. Dr. Parker stated that if L.B. was allowed to live alone without any supervision, "he [L.B.] would probably quit taking his medication and then I'm not sure what would happen.... I think he would be a risk for eventually deteriorating and not caring for himself as well as he should, and maybe becoming a liability in the community in that he might be disruptive or difficult, ..." Concluding that continued hospitalization was not necessary for L.B., Dr. Parker recommended that a semi-structured environment would be appropriate for L.B.'s needs.

While we recognize that Dr. Parker was not as cogent in his belief that L.B. required treatment as Dr. Park was, we note that "a court is not required to accept the testimony of expert witnesses as conclusive and has the right to judge the credibility of those witnesses." *Kottke v. U.A.M., supra*, 446 N.W.2d at 27. We are not prepared to conclude that the county court erred in its findings in light of Dr. Park's unequivocal testimony together with both experts' recommendations that L.B. be placed in a semi-structured environment.

Thus, after considering the foregoing evidence, we are of the opinion that the county court could have found that there was clear and convincing evidence that L.B. is a mentally ill person within the meaning of Section 25–03.1–02(9), N.D.C.C., who requires treatment pursuant to Section 25–03.1–02(10), N.D.C.C.

Alternatively, L.B. argues that no listing of alternative treatment options was presented at the treatment hearing as mandated by Section 25–03.1–21(1), N.D.C.C. This section provides in relevant part:

"Before making its decision in an involuntary treatment hearing, the court shall review a report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization which has been prepared and submitted by the state hospital or treatment facility."

In this case, the State Hospital supplied a report entitled "REPORT ASSESSING AVAILABILITY AND APPROPRIATENESS OF ALTERNATIVE TREATMENT." We find that the report submitted complied with the requirements of the statute and as required under *O'Callaghan v. L.B.*, 447 N.W.2d 326, 328 (N.D. 1989). Merely because the report listed no alternative treatment options due to L.B.'s resistance to alternative treatment[3] does not render the report submitted void for purposes of Section 25–03.1–21(1).

We affirm the county court's order of involuntary commitment with credit to be

---

**2.** L.B.'s past behavior included being incarcerated for manslaughter, making threats that he was going to kill his neighbor, and anti-social delusional behavior. *See O'Callaghan v. L.B.*, 447 N.W.2d 326, 327–28 (N.D.1989).

L.B.'s incarceration for manslaughter resulted from the death of a man that L.B. had beaten. When the victim was admitted to the hospital, he was in a semicomatose condition and had swollen eyes, multiple injuries to his face and head and several fractured ribs. The victim remained in a vegetative state until his death approximately six weeks after the assault.

The dissent argues that the mere possibility that L.B. may cause problems to his own health or to others is insufficient to involuntary commit him to treatment. The dissent overlooks the fact that L.B.'s prior conduct not only involved possibilities, but the reality of a death of a human being. When L.B.'s past history is taken in context with Dr. Park's testimony, made with knowledge of his past history, that L.B. could not control his temper and hostility under certain circumstances, it seems clear the decision of the trial court is supported by clear and convincing evidence.

**3.** We note that, after the filing of the alternative treatment report and prior to the treatment hearing, L.B. indicated to Dr. Park that he was willing to be placed in a structured environment treatment program.

given for time that L.B. has spent in treatment between the treatment hearing date and the date of this opinion.

ERICKSTAD, C.J., and VANDE WALLE and MESCHKE, JJ., concur.

LEVINE, Justice, dissenting.

Our law does not authorize or provide that every mentally ill or alcohol-dependent person requires treatment and certainly not by involuntary commitment. Yet the State has proceeded on just that basis. Through its questioning of the two expert witnesses, the State established only that L.B. was alcohol-dependent with associated dementia, that he has a mild passive-aggressive personality disorder, lacks judgment and insight and is on neuroleptic medication. The State also established that L.B. would probably not continue his medication if he were released from the hospital.

The State did not establish, and the record does not support the trial court's conclusion that L.B. is a person requiring treatment under our statutory criteria. Section 25–03.1–02(10), NDCC, defines a person requiring treatment as one who is mentally ill or chemically dependent, *and* there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, or others. Indeed, Dr. Park testified that L.B.'s recent history indicates only passivity, not aggressiveness, but that she relied on his prior manslaughter conviction as evidence of aggressiveness. However, she also states that L.B.'s passive-aggressive personality disorder is not the reason for hospitalization. Nor does Dr. Park advise hospitalization for alcohol treatment. The problem is, from this record, it is impossible to tell what is the reason for hospitalization other than for L.B. to take medication. But it is far from clear what consequences follow from his not taking medication. While medication may benefit a patient, benefit to the patient is not, without more, a sufficient cause for an involuntary commitment. *Radmore v. R.N.,* 450 N.W.2d 758 (N.D. 1990).

In its closing argument to the trial court, the State acknowledged that neither Dr. Park nor Dr. Parker knows what would happen if L.B. were released. They don't have to "know," but they must be able to express an opinion and a basis for that opinion that there is a reasonable likelihood of serious risk of harm absent treatment. Neither expert came close to satisfying this statutory requirement. The State argued to the trial court, however, that there was certainly "a possibility of problems" with "his own health" and "possible danger" to others. Our statutes do not authorize involuntary commitments for possibilities. I would reverse.