2001 ND 142

**In the Interest of H.G.**

**Nadeem Haider, M.D., Petitioner and Appellee**

v.

**H.G., Respondent and Appellant.**

**No. 20010197.**

Supreme Court of North Dakota.

Aug. 29, 2001.

Mark A. Flagstad, Assistant State's Attorney, Minot, for petitioner and appellee.

Eric P. Baumann, Kropp Law Offices, Jamestown, for respondent and appellant.

KAPSNER, Justice.

[¶ 1]  H.G. appeals from the Order for Hospitalization and Treatment and the Order to Treat with Medication.  We conclude the Order for Hospitalization and Treatment was not supported by clear and convincing evidence that H.G. is a person requiring treatment.  We reverse the Order for Hospitalization and Treatment and the Order to Treat with Medication and remand with directions to vacate the Order for Less Restrictive Treatment.

## I

[¶ 2] On June 19, 2001, a Petition for Involuntary Commitment was filed in Ward County, North Dakota. Following a preliminary hearing, a Temporary Treatment Order was issued under which H.G. was hospitalized and treated at the North Dakota State Hospital ("State Hospital") in Jamestown, North Dakota. Prior to the expiration of the 14–day Temporary Treatment Order, a treatment and medication hearing was held July 6, 2001. On July 9, 2001, an Order for Hospitalization and Treatment at the State Hospital for a period of 90 days was issued. An Order to Treat with Medication was also issued the same day. It specified H.G. was to be treated with Lithium, Depakote, and Prolixin for the same 90–day period. Subsequent to appealing both orders, but prior to oral argument, H.G. was released from the State Hospital and a less restrictive form of treatment was ordered, requiring medication compliance, follow-up with a psychiatrist, and weekly meetings with a therapist.

## II

[¶ 3] The respondent argues the district court erred in ordering H.G. to be involuntarily hospitalized and treated at the State Hospital because she is not a "[p]erson requiring treatment" as that term is defined in N.D.C.C. § 25–03.1–02(11). H.G. also asserts the district court erred in ordering treatment with medication under N.D.C.C. § 25–03.1–18.1. The scope of our review "is limited to a review of procedures, findings, and conclusions of the lower court." *In the Interest of L.B.*, 452 N.W.2d 75, 77 (N.D.1990). The district court's decision is to be based upon clear and convincing evidence, while this Court in turn subjects the district court's findings "to a more probing 'clearly erroneous' standard of review." *In the Interest of J.S.*, 2001 ND 10, ¶ 4, 621 N.W.2d 582. This Court treats the district court's finding of clear and convincing evidence a person requires treatment as a finding of fact, and will not set it aside unless it is clearly erroneous. *In the Interest of J.K.*, 1999 ND 182, ¶ 10, 599 N.W.2d 337. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence this Court is left with a definite and firm conviction a mistake has been made. *Peterson v. Peterson*, 1999 ND 191, ¶ 6, 600 N.W.2d 851.

[¶ 4] The burden of proof in commitment proceedings is on the petitioner to prove by clear and convincing evidence the respondent is a "person requiring treatment." *In the Interest of J.A.D.*, 492 N.W.2d 82, 83 (N.D.1992). There is a presumption the respondent does not require treatment. *Id.* at 85. Section 25–03.1–02(11), N.D.C.C., defines "[p]erson requiring treatment" as:

a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property. "Serious risk of harm" means a substantial likelihood of:

a. Suicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;

c. Substantial deterioration in physical health, or substantial injury, disease, or death, based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or

d. Substantial deterioration in mental health which would predictably result in

dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors.

N.D.C.C. § 25–03.1–02(11). The determination that an individual is a "person requiring treatment" is a two-step process. *J.A.D.*, at 83. First, "the court must find that the individual is mentally ill," and second, "the court must find that there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others, or property." *Id.* We hold the district court's findings are insufficient to subject H.G. to a mental health treatment order because the record lacks evidence to satisfy the requirements of N.D.C.C. § 25–03.1–02(11). Therefore, the finding that H.G. is a person in need of treatment is clearly erroneous.

[¶ 5] The first prong, finding H.G. to be mentally ill, is not clearly erroneous. Psychiatrist testimony at the July 6, 2001 hearing diagnosed H.G. as being a mentally ill person suffering from Bipolar I Disorder. Section 25–03.1–02(10), N.D.C.C., defines "[m]entally ill person" as "an individual with an organic, mental, or emotional disorder which substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations." This diagnosis was based upon the psychiatrist's examination, observations, and review of records of H.G. The respondent did not call a mental health official at the involuntary commitment hearing to refute the diagnosis of the psychiatrist, and there is evidence to support the finding of mental illness. However, simply because a person is mentally ill does not mean he or she is a person requiring treatment. *In the Interest of B.D.*, 510 N.W.2d 629, 631 (N.D.1994). The mentally ill person must

also pose a serious risk of harm to oneself, others, or property if not treated. *Id.*

[¶ 6] The "[s]erious risk of harm" prong of the involuntary commitment procedure means a substantial likelihood of the existence of at least one of four factors. *See* N.D.C.C. § 25–03.1–02(11). The first factor, substantial likelihood of suicide, is not present in this case, which the petitioner concedes. *See* N.D.C.C. § 25–03.1–02(11)(a). Evidence of the second factor, substantial likelihood of killing or inflicting serious bodily harm or property damage, is neither present in this case in an admissible form in the record nor relied upon by the district court as a basis for its orders. *See* N.D.C.C. § 25–03.1–02(11)(b). Testimony concerning an incident in which H.G. was allegedly driving a vehicle in a manner which could be construed as likely to result in serious bodily harm was disregarded by the district court because it was inadmissible hearsay. Other testimony involving an allegedly threatening message left by H.G. on a telephone answering machine was not mentioned in the district court's findings. A police report suggesting physical aggression on the part of H.G. against members of the Minot Police Department was attached to the original Petition for Involuntary Commitment, but no testimony about the incident was presented at the July 6, 2001 treatment hearing.

[¶ 7] There is nothing in the record to indicate the third factor, "[s]ubstantial deterioration in physical health ... based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care," is present. N.D.C.C. § 25–03.1–02(11)(c). When asked if a lack of treatment would lead to deterioration of H.G.'s physical health, the testifying psychiatrist answered "[w]e do not have information to indicate that [H.G.] has physical problems which would worsen if [H.G.] were not treated."

[¶ 8]  Subsection (d) is the factor upon which the decision to involuntarily commit was apparently based.  Subsection (d) states a serious risk of harm exists when there is a substantial likelihood of a "[s]ubstantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors." N.D.C.C. § 25–03.1–02(11)(d).  The entire findings of the district court, given orally at the conclusion of the hearing, are as follows:

> Okay. The evidence is established that the respondent suffers from a bipolar disorder, Bipolar Disorder I, which is a very serious disorder.
>
> As far as business acumen of the respondent is concerned, ordinarily it is not a good business practice to write a $1,000 check in anticipation of a check coming in.  Ordinarily the more prudent thing would be to have the money in hand before the check is written.  As it is, some of the other activities, the dancing or whatever it was in the middle of the night on the sidewalk is not appropriate, or on her lawn.  To say the least that is somewhat bizarre behavior which leads me to believe that the condition, if not treated, will be detrimental to the health of the respondent.  The Court orders a 90 day treatment order with medication.

[¶ 9]  The district court refers to H.G.'s business acumen and business practices as reason for concluding a serious risk of harm of substantial deterioration in mental health would predictably result in dangerousness to H.G.'s property.  It is undoubtedly true, as the district court stated, that it is "not a good business practice to write a $1,000 check in anticipation of a check coming in.  Ordinarily the more prudent thing would be to have the money in hand before the check is written."  However, lack of prudence in business affairs is not the type of dangerousness to property envisioned by the statute as a basis for involuntary commitment.  There is no testimony the $1,000 check was ever cashed.  Furthermore, unchallenged testimony at the involuntary commitment hearing established H.G. had never filed for, or was close to, bankruptcy during the years of running various businesses.  The record is not clear and convincing that H.G.'s condition was threatening to H.G.'s business property.  Even if the businesses were to fold, it is not clear the cause would be H.G.'s mental illness.

[¶ 10]  While this Court has not had prior occasion to review a case arising under N.D.C.C. § 25–03.1–02(11) involving danger to property, a case decided under the prior version of N.D.C.C. § 25–03.1–02(11) is instructive of the magnitude of threat to property which will justify civil commitment.  In *In the Interest of Nyflot*, the respondent was determined to be a serious risk of harm of inflicting serious bodily harm or property damage in part because she started two separate fires in the women's bathroom at the dormitory at the State Hospital.  *In the Interest of Nyflot*, 340 N.W.2d 178, 184 (N.D.1983).  The earlier version of N.D.C.C. § 25–03.1–02(11), applicable to *Nyflot*, contained only the first three of the four factors currently found in the statute.  *Id.* at 183–84.  Nevertheless, *Nyflot* provides an example of the danger to property envisioned by the statute.  The liberty interest of freedom from bodily restraint is of the highest order.  Because an involuntary commitment is a " 'massive curtailment of liberty,' " it is clear "involuntary commitment to a mental institution is a significant deprivation of liberty which the state cannot accomplish without due process."  *In the Interest of J.B.*, 410 N.W.2d 530, 532 (N.D.1987).

Due process in this instance requires compliance with the statutory requirements of N.D.C.C. § 25–03.1–02(11). Before a person is deprived of their liberty through involuntary commitment proceedings, the danger to property a respondent potentially presents should more closely resemble the fires in *Nyflot* than the business practices of H.G. *See Nyflot*, at 184. In addition to presenting a danger, subsection (d) of the current version also injects an element of predictability into danger to property. *See* N.D.C.C. § 25–03.1–02(11)(d). The record is void of any harm to property in the past which "establishes a potential for serious harm by future behavior of the respondent acting in conformity with previous conduct." *Nyflot*, at 184. The lack of prudence and business acumen alleged in this case is not the predictable dangerousness to property envisioned by N.D.C.C. § 25–03.1–02(11) sufficient to subject a person to a mental health treatment order.

### III

[¶ 11] The district court's Order for Hospitalization and Treatment is not supported by clear and convincing evidence that H.G. is a person requiring treatment. Because the Order for Hospitalization and Treatment is reversed, the Order to Treat with Medication must also be reversed and the Order for Less Restrictive Treatment must be vacated. N.D.C.C. § 25–03.1–19. Before a district court can order a person to be involuntarily treated with medication, four separate findings must be certified by the treating psychiatrist and another licensed physician or psychiatrist. N.D.C.C. § 25–03.1–18.1(1)(a); *In the Interest of J.S.*, 528 N.W.2d 367, 368 (N.D. 1995). However, this section initially requires the person who is to be medicated to be "under a mental health treatment order." N.D.C.C. § 25–03.1–18.1(1)(a). Because we have determined the record

does not support a valid mental health treatment order, we reverse the Order to Treat with Medication. We also direct the district court to vacate the Order for Less Restrictive Treatment because evidence establishing a person requiring treatment is the predicate to an alternative treatment order under N.D.C.C. § 25–03.1–21.

[¶ 12] The orders are reversed and remanded with directions.

[¶ 13] VANDE WALLE, C.J., and SANDSTROM, NEUMANN, MARING, JJ., concur.