742 N.W.2d 41 (2007)
2007 ND 186
Interest of B.D.K.
Adam Miller, PSY.D., Petitioner and Appellee
v.
B.D.K., Respondent and Appellant.
No. 20070320.
Supreme Court of North Dakota.
December 5, 2007.
*42 Gary E. Euren, Assistant State's Attorney, Fargo, for petitioner and appellee.
Douglas W. Nesheim, Fargo, for respondent and appellant.
MARING, Justice.
[¶ 1] B.K. appeals a district court order involuntarily committing him to the North Dakota State Hospital for ninety days. We affirm.

I
[¶ 2] B.K. has been diagnosed with schizoaffective disorder-bipolar and antisocial personality disorder. On October 1, 2007, the district court committed B.K. to the State Hospital for ninety days.
[¶ 3] The record reveals that, on September 10, 2007, B.K. was kicked out of two downtown Fargo businesses, one of which was a bar, for being disruptive and threatening. B.K. called his family in an attempt to acquire his father's guns. He talked about the CIA, "horsemen," and demanded to see a federal judge. B.K. was brought to the emergency room by *43 law enforcement officers and Southeast Human Services employees. He was admitted to MeritCare in Fargo. He was transferred to the North Dakota State Hospital on September 12. The State Hospital admission form reported his hospitalization was necessary for safety, because B.K. acted psychotically and tried to access weapons. The form also stated that B.K. was too violent and psychotic at the time of his admission to be placed in the community.
[¶ 4] On September 13, Dr. William Pryatel, a staff psychiatrist at the State Hospital, completed a report of examination. The report concluded B.K. is a mentally ill person. The report provided that a serious risk of harm to B.K., others, or property exists. According to the report, there is also a substantial likelihood of B.K. killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats. Finally, the report provided that B.K. faces a substantial likelihood of substantial deterioration in physical health, or substantial injury, disease, or death resulting from poor self-control or judgment in providing for shelter, nutrition, or personal care.
[¶ 5] Dr. Pryatel prepared a report assessing the availability and appropriateness of alternate treatment on September 25. The report listed case management, psychiatrist appointments, and medication management by Southeast Human Services as treatment programs considered for B.K. Dr. Pryatel concluded that an alternate treatment program would not be sufficient to meet B.K.'s treatment needs because he is very delusional, verbally and physically threatening, aggressive, uncooperative, and unable to care for himself and attend to his activities of daily living. Dr. Pryatel also concluded alternate treatment would not prevent the danger to self, others, or property presented by B.K. because he is not cooperative at the State Hospital, he trashed his apartment, he was not caring for his dog, and he was not attending to his finances or taking his medications.
[¶ 6] The record indicates that B.K. is taking a series of medications at the State Hospital. Some of the medications are taken on a regular basis and some are p.r.n. medications. The abbreviation "p.r.n." stands for the Latin term "pro re nata," which means "as the occasion arises; when necessary." PDR Medical Dictionary 1445 (2d ed. 2000). The drugs taken on a regular basis include Cogentin, Topiramate, Propranolol, Seroquel, Hydrodiuril, and Zydis. The p.r.n. drugs taken to calm B.K. and stabilize his mood include Vistaril, Loxapine, and Zydis.
[¶ 7] B.K. waived his right to a preliminary hearing. A treatment hearing was held before District Court Judge Steven McCullough on October 1, 2007. Only Dr. Pryatel and B.K. testified at the hearing. Dr. Pryatel, who testified he was familiar with B.K. because he has been admitted to the State Hospital on several prior occasions, said B.K. had been decompensating for several weeks prior to the incident in Fargo on September 10. Decompensation is "[t]he appearance or exacerbation of a mental disorder due to failure of defense mechanisms." PDR Medical Dictionary 462 (2d ed. 2000).
[¶ 8] Dr. Pryatel testified that B.K. has improved since his admission to the State Hospital, but still experiences delusions. Dr. Pryatel testified that B.K.'s delusions have included statements about Russians being at the Canadian border, claims that his father killed John F. Kennedy, statements about flying saucers, claims he has been sent by God as Apollo, and statements that Mark the archangel kicked in his apartment door. Dr. Pryatel testified *44 that, in order to settle down, B.K. requires p.r.n. medications, and B.K. sleeps only three to four hours per night.
[¶ 9] B.K. testified he saw Jesus Christ in a vision when he was in fifth grade, and a light that appeared at that time "screwed him up." He asserted FBI agents tried to drown him in a prison shower because of God's light. He claimed other patients at the State Hospital hit him, but he knows better than to hit back. He testified his father shot John F. Kennedy and Martin Luther King. He further testified that his father told him he would be safe only in Chicago. He claimed to know a man in Russia who was in a Missouri prison and who blew out some windows in New York to get a Japanese girl to get B.K.B.K. asserted that this man would make a life for him in Russia, where he will have a home and can go swimming.
[¶ 10] In his testimony, B.K. disputed the reason for being initially picked up in downtown Fargo and admitted to MeritCare. B.K. testified that the events leading to his involuntary commitment began when he told a Marine at the Empire Bar that the man was an old seal. B.K. asserted he went into the bar parking lot and peacefully finished his drink, after which he returned the drink glasses to the bar. He said he asked his family for guns so that he could sell them and use the proceeds to get to Russia. He testified he would stay on his medications if released from the State Hospital. B.K. asserted he is not a danger to others. B.K. testified that he has not been violent while at the State Hospital. He said he was unwilling to work with Southeast Human Services, but would be willing to hire his own psychiatrist. If he were released, he testified his plan would be to get his golden lab back and do drywall work in Fargo.
[¶ 11] At the hearing, Judge McCullough found by clear and convincing evidence that B.K. is a mentally ill person. Judge McCullough labeled B.K.'s case a close one, but concluded there is adequate evidence showing B.K. is a person requiring treatment because of a substantial likelihood he will be a danger to others and that his mental health will deteriorate significantly if no treatment is received. Judge McCullough found B.K. may have been a danger to others when he engaged in the alleged delusional and disruptive behavior in downtown Fargo that led to his hospitalization at MeritCare. Based on B.K.'s unwillingness to work with Southeast Human Services, Judge McCullough concluded there is no less restrictive alternative treatment available. An order for hospitalization and treatment signed by District Court Judge Georgia Dawson committed B.K. to the State Hospital for ninety days.
[¶ 12] B.K. appealed the district court order. We temporarily remanded this matter to the district court under N.D.R.App.P. 35(a)(3) instructing that either Judge McCullough file written findings of fact, conclusions of law, and order following treatment or continuing treatment hearing, or Judge Dawson certify compliance under N.D.R.Civ.P. 63. On remand, Judge McCullough made and filed with this Court findings of fact, conclusions of law, and order. On appeal, B.K. requests reversal of the district court order and dismissal of the petition for involuntary commitment. Alternately, B.K. requests that the matter be remanded with instructions to order a less restrictive treatment.

II
[¶ 13] Review of an appeal under N.D.C.C. ch. 25-03.1 is limited to a review of the procedures, findings, and conclusions of the district court. N.D.C.C. § 25-03.1-29; Interest of D.A., 2005 ND *45 116, ¶ 11, 698 N.W.2d 474. "Balancing the competing interests of protecting a mentally ill person and preserving that person's liberty, requires trial courts to use a clear and convincing standard of proof" while this Court uses "the more probing clearly erroneous standard of review." Id. "A trial court's finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence this Court is left with a definite and firm conviction it is not supported by clear and convincing evidence." Id. (citation omitted).

III
[¶ 14] On appeal, B.K. argues the district court erred in finding there was clear and convincing evidence to support an order for involuntary in-patient treatment under N.D.C.C. ch. 25-03.1. B.K. further argues the district court erred in not ordering less restrictive treatment. The State Hospital argues the district court did not err in finding clear and convincing support for involuntary treatment of B.K. The State Hospital also argues the district court did not err in refusing to order less restrictive treatment for B.K.
[¶ 15] In commitment proceedings, the burden of proof is on the petitioner to prove by clear and convincing evidence the respondent is a "person requiring treatment." In re H.G., 2001 ND 142, ¶ 4, 632 N.W.2d 458. The respondent is presumed to not require treatment. Id. Only an individual who is a "person requiring treatment" may be involuntarily admitted to the state hospital or another treatment facility. N.D.C.C. § 25-03.1-07. Proof that an individual will merely benefit from treatment does not satisfy this standard. In Interest of M.B., 467 N.W.2d 902, 904 (N.D.1991). The statutory definition of a "person requiring treatment" is provided in N.D.C.C. § 25-03.1-02(12):
"Person requiring treatment" means a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property. "Serious risk of harm" means a substantial likelihood of:
a. Suicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;
b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;
c. Substantial deterioration in physical health, or substantial injury, disease, or death, based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or
d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon evidence of objective facts to establish the loss of cognitive or volitional control over the person's thoughts or actions or based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors, including the effect of the person's mental condition on the person's ability to consent.
[¶ 16] Determining whether someone is a "person requiring treatment" is a two-step process. In re H.G., 2001 ND 142, ¶ 4, 632 N.W.2d 458. "First, the court must find that the individual is mentally ill, and second, the court must find that there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others, or property." Id. (citation omitted). *46 "Direct evidence of overt violence or an expressed intent to commit violence are not required" for a court to find clear and convincing evidence to support a finding that an individual poses a serious risk of harm. In re D.P., 2001 ND 203, ¶ 9, 636 N.W.2d 921.
[¶ 17] An individual who is a "person requiring treatment" has a right to be submitted to the least restrictive treatment option under N.D.C.C. § 25-03.1-21(1), which provides:
Before making its decision in an involuntary treatment hearing, the court shall review a report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization which has been prepared and submitted by the state hospital or treatment facility. If the court finds that a treatment program other than hospitalization is adequate to meet the respondent's treatment needs and is sufficient to prevent harm or injuries which the individual may inflict upon the individual or others, the court shall order the respondent to receive whatever treatment other than hospitalization is appropriate for a period of ninety days.
A two-part inquiry is used to determine the availability of a less restrictive alternative treatment. See In re M.M., 2005 ND 219, ¶ 12, 707 N.W.2d 78. First, the court asks whether treatment other than hospitalization is adequate to meet the individual's needs. Id. Second, the court asks "whether an alternative treatment program is sufficient to prevent harm or injuries which the individual may inflict upon himself or others." Id.

IV
[¶ 18] B.K. argues he is not a person requiring treatment under N.D.C.C. § 25-03.1-02(12). Because the parties do not dispute that B.K. is mentally ill, B.K. meets the first part of the test to determine whether he is a person requiring treatment. The second question is whether there is a reasonable expectation that if B.K. is not hospitalized there exists a serious risk of harm to himself, others, or property. The district court found clear and convincing evidence that B.K. is a person requiring treatment because of a substantial likelihood he will be a danger to others and that his mental health will deteriorate significantly if no treatment is received. In the context of determining whether an individual is a person requiring treatment, we have previously said that "[w]hen one or more reasonable inferences can be drawn from credible evidence, this Court must accept the inferences drawn by the trial court." In re M.M., 2005 ND 219, ¶ 11, 707 N.W.2d 78 (citation omitted).
[¶ 19] The evidence in the record and the testimony at B.K.'s commitment proceeding permit reasonable inferences to be drawn in support of the district court's finding. In B.K.'s testimony, he acknowledges his involvement in the altercation in Fargo. While B.K. asserts he wanted access to guns only to sell the guns and use the profits therefrom, he does not deny that he sought possession of guns following the altercation. B.K. exhibited delusional thoughts during his testimony. The State Hospital has to administer p.r.n. drugs to B.K. in order to stabilize his mood. Dr. Pryatel provided expert testimony that B.K. is delusional, had been decompensating for a period of time before being admitted to the State Hospital, is getting inadequate sleep, and poses a danger to himself or others. Dr. Pryatel testified that not hospitalizing B.K. would be "risky," and Dr. Pryatel cannot be sure B.K. would take his medications. There is a reasonable expectation that if B.K. is not hospitalized there exists a serious risk of harm to himself, others, or property. *47 Thus, B.K. meets the second part of the test to determine whether he is a person requiring treatment.
[¶ 20] We conclude the district court's findings that B.K. is a person requiring treatment because of a substantial likelihood he will be a danger to others and that his mental health will deteriorate significantly if no treatment is received are not clearly erroneous.

V
[¶ 21] B.K. further argues hospitalization is not the least restrictive treatment option available under N.D.C.C. § 25-03.1-21(1). The two-part inquiry to determine the availability of a least restrictive alternative treatment requires consideration of whether treatment other than hospitalization is adequate to meet B.K.'s needs and whether a less restrictive alternative treatment is sufficient to prevent the harm or injuries B.K. may inflict upon himself or others. The district court found there was no less restrictive alternative than hospitalization adequate to treat B.K.
[¶ 22] The district court's finding that there is no less restrictive alternative than hospitalization adequate to treat B.K. is supported by clear and convincing evidence from the record. The report assessing the availability and appropriateness of alternate treatment listed case management, psychiatrist appointments, and medication management by Southeast Human Services as alternate treatment programs considered for B.K. The report concluded none of these alternate treatments would be sufficient to meet B.K.'s needs, nor would they prevent the danger to self, others, or property presented by B.K. At the treatment hearing, Dr. Pryatel testified that he was uncomfortable with the idea of discharging B.K. back into the community, and that B.K. is "just not good enough yet" to be treated in a less restrictive manner. He also testified that he cannot be sure B.K. would take his prescribed medications if he is not hospitalized. Dr. Pryatel said there are improvements that need to be made before B.K. would be able to function in the community: He should sleep five to six hours per night, require p.r.n. medications less frequently, and make fewer delusional comments. The district court's finding that there is no less restrictive alternative than hospitalization adequate to treat B.K. was not clearly erroneous.
[¶ 23] B.K. contends that the district court impermissibly required his hospitalization on the basis that B.K. is unwilling to cooperate with Southeast Human Services. B.K. asserts he would find his own psychiatrist and take his medications as prescribed. The State Hospital established, by clear and convincing evidence, that B.K. is a mentally ill individual requiring in-patient treatment. B.K's bare assertion that he would get his own psychiatrist does not constitute a viable alternative to hospitalization requiring the district court to order less restrictive treatment. B.K. provided no details regarding how he would go about locating a psychiatrist or how he would pay for such treatment. Moreover, several of his medications are taken on an as-needed basis, and there was no indication he would be able to administer those medications on his own.
[¶ 24] We conclude the district court's finding that there is no less restrictive alternative than hospitalization adequate to treat B.K. is not clearly erroneous.

VI
[¶ 25] We affirm the district court's order involuntarily committing B.K. to the North Dakota State Hospital for ninety days.
*48 [¶ 26]GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.