Filed 7/13/10 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2010 ND 131

In the Interest of C.A.H.

North Dakota State Hospital, Petitioner and Appellee

v.

C.A.H., Respondent and Appellant

No. 20100162

Appeal from the District Court of Stutsman County, Southeast Judicial District, the Honorable John E. Greenwood, Judge.

AFFIRMED.

Opinion of the Court by Kapsner, Justice.

Haley L. Wamstad (argued), Assistant State’s Attorney, and Sean B. Kasson (on brief), appearing under the Rule on the Limited Practice of Law by Law Students, 124 South 4th Street, P.O. Box 5607, Grand Forks, ND 58206-5607, for petitioner and appellee.

Lawrence P. Kropp (argued), 105 10th Street SE, Jamestown, ND 58401-5549, for respondent and appellant.

Interest of C.H.

No. 20100162

Kapsner, Justice.

[¶1] C.H. appeals a district court order for hospitalization and treatment and an order to treat with medication.  We hold the district court’s findings that C.H. is a person requiring treatment and involuntary hospitalization is the least restrictive form of appropriate treatment are not clearly erroneous, and the district court did not err by ordering involuntary treatment with medication.  We affirm the district court orders.

I.

[¶2] C.H. is a 38-year-old male.  On February 8, 2010, C.H.’s sister filed a petition under oath with the district court for C.H.’s involuntary commitment.  The petition claimed C.H. was mentally ill and, as a result, there was a reasonable expectation of a serious risk of harm if he did not receive treatment.  C.H.’s sister also included a letter as part of the sworn petition, which stated in part:

My biggest fear is that [C.H.] is going to cause harm to my family.  Comments such as “your children should not have to live in this terrible world and deal with all the bad stuff” and “I wish Dad was not around”, scare me to the core.  My brother [D.H.] would not make a statement due to his fear of [C.H.] from an incident in which [D.H.] was physically hurt.

. . . .

I am scared for my husband, children, parents, and myself.  I am scared of [C.H.] stopping by our home again, because I am scared to ask him to leave.  We are fearful of [C.H.]. . . .  I am very scared of what he is physically capable of doing.  I do not want any of my family members hurt, or dead.

The district court held a preliminary hearing on February 18, 2010.  The district court found there was probable cause to believe C.H. is a person requiring treatment and ordered C.H. undergo involuntary treatment at the North Dakota State Hospital for up to fourteen days.

[¶3] The district court held a treatment and medication hearing on April 28, 2010.  Dr. William Pryatel, a psychiatrist at the state hospital, testified he had personally treated C.H. since his most recent commitment in February, as well as during several previous commitments.  Pryatel stated C.H. suffers from “Schizoaffective Disorder Bipolar Type” and an associated personality disorder.  Pryatel testified C.H. had been treated at the state hospital on approximately six previous occasions, with the same pattern of behavior often repeating.  Pryatel stated the general pattern involves C.H. “getting off the medication, becoming manic, then getting to the attention of the authorities somehow or the other and then being sent here to the State Hospital.”  Since being committed in February 2010, Pryatel testified C.H.’s behavior included “delusional speech . . . pressured speech, elevated mood, agitation, [and] irritability.”

[¶4] Pryatel stated C.H. poses a risk of harm to others because “on the outside his family is all afraid of him . . . .  They’ve made statements that are on the chart here about his behavior in the community . . . and they feel threatened by him.”  Pryatel testified C.H. also made a threatening statement to a state hospital staff member: “[C.H.] said quote that Navy bitch better watch out, when I get out I’ll be looking for him and showing him what I can do.”  Pryatel stated C.H. has also pointed his finger towards staff members’ noses and invaded their body space in a manner “that we would consider physically intimidating because he’s a large man.”  Despite behavior he considers threatening, Pryatel acknowledged C.H. has not been physically violent since his most recent commitment.

[¶5] Pryatel testified there was a substantial risk of deterioration in C.H.’s physical health if the temporary order for hospitalization and treatment was not extended.  Pryatel stated C.H. was not suffering from any physical ailments when he was committed to the state hospital in February 2010.  However, Pryatel testified:

The way [C.H.] is right now I don’t feel that he can live in a homeless shelter because his behavior is just too intense, too manicky that they would not be able to deal with him . . . .  I don’t feel he can be employable the way he is right now.  So I don’t really feel he can provide himself food, clothing and shelter in his current condition.

Pryatel also stated there is a substantial risk of deterioration in C.H.’s mental health because “one follows the other that the more the physical health is impaired the more the mental health will follow behind . . . .”

[¶6] Pryatel testified C.H. requires treatment with medication.  Pryatel stated the state hospital has offered medication to C.H., but he has refused.  He testified medication would help C.H. become “less manic,” no longer have “rambling disorganized speech,” make “rational decisions,” and generally improve his self-

control.  Pryatel stated medication has helped C.H. in the past:  “There’s no indication that [C.H.] would not respond to [medication] just fine at this time.  He has gotten some . . . medication [during previous involuntary hospitalizations] at the State Hospital and for a period afterwards he’s been more calm.”  Pryatel testified the proposed medications have “motor side effects which have to do with the voluntary musculature” and “metabolic side effects,” such as weight gain and increased risk for diabetes, stroke, and heart attack.  Pryatel stated no treatment other than hospitalization and medication was appropriate because C.H. is “just too manicky to be managed in the community,” and he has “a history of poor medication compliance.”

[¶7] Dr. Harjinder Virdee, a private practice psychiatrist, testified she performed an independent evaluation of C.H., which included a one-hour meeting with C.H. and a review of his state hospital records.  Virdee testified C.H. suffers from “Schizoaffective Disorder Bipolar Type,” as well as “Antisocial Personality traits.”  Virdee stated C.H.’s mental illness was “[s]ufficiently severe . . . to necessitate hospitalization to prevent harm to self or others or other psychotic features.”  Virdee testified C.H. would have difficulty taking care of his physical needs because “the level of communicative difficulties that [C.H. is] having would interfere with a meaningful employment or taking care of himself.”  Virdee also testified C.H. presents a danger to himself and others because he has a history of driving offenses, and “one of the things that happens in manic state, the person starts to feel over confident and drive very fast.  And when they drive very fast they endanger themselves and others.”  Virdee noted documentation from C.H.’s family members indicates they feel threatened by him as well.

[¶8] Without treatment, Virdee testified C.H.’s mental health would likely deteriorate because C.H. “was not able to judge for himself that his thought processes were off . . . .”  Speaking more generally, Virdee stated:  “One of the reasons why we think about deterioration [of mental health] is manic phase can lead into manic psychosis and mania is when you would want to catch it and treat it because it could deteriorate into a psychotic state.”  Virdee testified C.H. is “right on the edge” of going from mania to psychosis.  Virdee also stated C.H. requires treatment with medication, which would improve C.H.’s thought process and mood.  Virdee testified inpatient treatment is the best alternative for C.H. at this point:  “I think, you know, when he gets better he could be in out-patient but I think at this point he needs something to help him slow down and to be able to control his impulses . . . .”

[¶9] C.H. testified on his own behalf and acknowledged a history of mental illness:

I did have a psychosis in the past when I used methamphetamine when I was about 26 years old, 27.  After I got divorced I went into a depression . . . .  But there was no mania.  Excited about getting different business opportunities, yes.  Excitement, normal, not jump off the building mania.  Now when I had the psychosis, like I said, when you asked if I was mentally ill I had a psychosis that was called paranoia.

C.H. stated methamphetamine use caused previous chemical imbalances, but he has not used for several years.  When asked about the circumstances leading to his most recent commitment, C.H. stated:  “Three sheriff’s came to me at the homeless shelter and when I was [there] at the homeless shelter they said I wasn’t making my keep there because I couldn’t get North Dakota help for unemployment.”  C.H. also provided some unclear testimony about the role of his sister, who filed the petition for commitment.

[¶10] C.H. testified he would “never” be a danger to himself or others.  C.H. admitted calling a worker at the state hospital a “fuckin loser,” but C.H. denied threatening any state hospital workers.  C.H. explained his refusal to take medication: “I do not need any.  And the medication that [Pryatel is] saying have real bad symptoms that I know exist.”  Following his most recent prior commitment in 2009, C.H. stated he quit taking his medication a “[l]ittle bit” after he was released because he “started getting nervous and involuntary muscle movements.”  Several times during his testimony, C.H. strayed from the attorneys’ questions and made long, rambling statements about various topics, including “electronic circuitable electricity,” global warming, and the military.  The district court also had to ask C.H. to stop interrupting the psychiatrists’ testimony on several occasions and to warn him against making further outbursts.

[¶11] At the conclusion of the hearing, the district court stated:  “The Court finds the evidence is clear and convincing to indicate that [C.H.] is a mentally ill person.  The diagnosis testified by both Dr. Pryatel and Dr. Virdee is Schizoaffective Disorder Bipolar Type.”  The district court also found C.H. “is in a manic phase that can deteriorate if he’s not treated into psychosis” and “if [C.H.] is not treated there exists a serious risk of harm to himself or others, a substantial likelihood of a substantial deterioration of his mental health that could predictably result in dangerousness to himself or others . . . .”  The district court found clear and convincing evidence “that a treatment program other than hospitalization would not be adequate to meet [C.H.’s] needs or be sufficient to prevent harm or injury to himself or others.”  Finally, the district court found the medications recommended by Pryatel were clinically appropriate and the least intrusive form of effective treatment for C.H.  Therefore, the district court issued an order for hospitalization and treatment, as well as an order to treat with medication for up to 90 days.  C.H. now appeals both orders.

II.

[¶12] This Court explained its review of an appeal from orders for involuntary treatment and hospitalization and for treatment with medication under N.D.C.C. ch. 25-03.1 in 
Interest of D.A.
:

This Court’s review of an appeal under N.D.C.C. ch. 25-03.1 is limited to a review of the procedures, findings, and conclusions of the trial court.  
In the Interest of J.D.
, 2002 ND 50, ¶ 13, 640 N.W.2d 733.  Balancing the competing interests of protecting a mentally ill person and preserving that person’s liberty, requires trial courts to use a clear and convincing standard of proof while we use the more probing clearly erroneous standard of review.  
Id.
  A trial court’s finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire evidence this Court is left with a definite and firm conviction “it is not supported by clear and convincing evidence.”  
Id.
 (quoting 
In Interest of R.N.
, 513 N.W.2d 370, 371 (N.D. 1994)).

2005 ND 116, ¶ 11, 698 N.W.2d 474.

A.

[¶13] C.H. argues the district court’s finding that he is a “person requiring treatment” is clearly erroneous.  Under N.D.C.C. § 25-03.1-02(12), a “[p]erson requiring treatment” is defined as “a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated for the mental illness or chemical dependency there exists a serious risk of harm to that person, others, or property.”  As this Court explained in 
Interest of B.D.K.
:

[T]he burden of proof is on the petitioner to prove by clear and convincing evidence the respondent is a “person requiring treatment.”  
In re H.G.
, 2001 ND 142, ¶ 4, 632 N.W.2d 458.  The respondent is presumed to not require treatment.  
Id.
  Only an individual who is a “person requiring treatment” may be involuntarily admitted to the state hospital or another treatment facility.  N.D.C.C. § 25-03.1-07.  Proof that an individual will merely benefit from treatment does not satisfy this standard.  
In Interest of M.B.
, 467 N.W.2d 902, 904 (N.D. 1991). . . .

Determining whether someone is a “person requiring treatment” is a two-step process.  
In re H.G.
, 2001 ND 142, ¶ 4, 632 N.W.2d 458.  “First, the court must find that the individual is mentally ill, and second, the court must find that there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others, or property.”  
Id.
 (citation omitted).  “Direct evidence of overt violence or an expressed intent to commit violence are not required” for a court to find clear and convincing evidence to support a finding that an individual poses a serious risk of harm.  
In re D.P.
, 2001 ND 203, ¶ 9, 636 N.W.2d 921.

2007 ND 186, ¶¶ 15-16, 742 N.W.2d 41.

[¶14] The district court found clear and convincing evidence establishes C.H. is a mentally ill person.  Section 25-03.1-2(11), N.D.C.C., defines a “[m]entally ill person” as “an individual with an organic, mental, or emotional disorder which substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations.”  Both psychiatrists testified C.H. suffers from schizoaffective disorder bipolar type, and C.H. provides no argument rebutting the diagnosis.  We hold the district court’s finding that C.H. is a mentally ill person is not clearly erroneous.

[¶15] C.H. also argues the district court’s finding that he poses a “serious risk of harm” is clearly erroneous.  Under N.D.C.C. § 25-03.1-02(12), a “serious risk of harm” includes a substantial likelihood of:  “inflicting serious bodily harm on another person”; a “[s]ubstantial deterioration in physical health . . . based upon recent poor self-control or judgment in providing one’s shelter, nutrition, or personal care”; or a “[s]ubstantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon evidence of objective facts to establish the loss of cognitive or volitional control over the person’s thoughts or actions or based upon acts, threats, or patterns in the person’s treatment history, current condition, and other relevant factors . . . .”

[¶16] C.H. claims the district court’s finding is clearly erroneous because it is unsupported by evidence.  C.H. claims the psychiatrists’ testimony establishes he was not suffering from any physical ailments when he was committed in February 2010, which demonstrates he is not at risk of substantial deterioration in physical health.  In addition, C.H. argues the evidence does not demonstrate he presents a serious risk of harm to others.  As support, C.H. notes there is no evidence he acted violently either immediately before or after his most recent commitment, and the psychiatrists testified some of his behavior towards state hospital workers could be attributed to his anger at having been committed.

[¶17] We hold the district court’s finding that, if not treated, there is a reasonable expectation C.H. presents a serious risk of harm to himself or others is supported by evidence and not clearly erroneous.  The letter from C.H.’s sister, which was incorporated into the sworn petition for commitment, indicates a substantial likelihood of C.H. inflicting serious bodily harm on another person.  C.H.’s sister wrote:  “My biggest fear is that [C.H.] is going to cause harm to my family.  Comments such as ‘your children should not have to live in this terrible world and deal with all the bad stuff’ and ‘I wish Dad was not around’, scare me to the core.”  C.H.’s sister also wrote their brother was scared of C.H. based on “an incident in which [the brother] was physically hurt.”  Finally, C.H.’s sister stated:  “I am very scared of what he is physically capable of doing.  I do not want any of my family members hurt, or dead.”  The psychiatrists also cited statements by C.H.’s family members when opining that C.H. presents a risk of harm towards others.  Therefore, evidence regarding threats C.H. made to his family supports the district court’s finding that C.H. presents a serious risk of harm to others.

[¶18] In addition, the psychiatrists’ testimony establishes a substantial likelihood of a substantial deterioration in C.H.’s physical and mental health.  Pryatel testified C.H.’s manic behaviors make it unlikely he would be able to stay in a homeless shelter or find work.  Without treatment, Pryatel stated C.H. would be unable to provide himself with food, clothing, and shelter.  Virdee also stated C.H. would have difficulty taking care of his physical needs.  In addition, Pryatel testified there is a substantial risk of deterioration in C.H.’s mental health because “one follows the other that the more the physical health is impaired the more the mental health will follow behind . . . .”  Virdee stated that, without treatment, C.H.’s mental illness creates a substantial risk to himself because his mania is “right on the edge” of psychosis.  Based upon this evidence, we hold the district court’s finding that C.H. is a “person requiring treatment” under N.D.C.C. § 25-03.1-02(12) is not clearly erroneous.

B.

[¶19] C.H. argues the district court’s finding that involuntary treatment and hospitalization is the least restrictive form of appropriate treatment was clearly erroneous.  Section 25-03.1-21(1), N.D.C.C., provides:

Before making its decision in an involuntary treatment hearing, the court shall review a report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization . . . .  If the court finds that a treatment program other than hospitalization is adequate to meet the respondent’s treatment needs and is sufficient to prevent harm or injuries which the individual may inflict upon the individual or others, the court shall order the respondent to receive whatever treatment other than hospitalization is appropriate . . . .

Thus, “[w]hen an individual is found to be a person requiring treatment he has the right to the least restrictive conditions necessary to achieve the purposes of the treatment.”  
Interest of M.M.
, 2005 ND 219, ¶ 12, 707 N.W.2d 78 (quoting 
Interest of D.Z.
, 2002 ND 132, ¶ 10, 649 N.W.2d 231).  In assessing the propriety of alternatives to hospitalization, a court must consider (1) whether the alternative is adequate to meet the individual’s treatment needs, and (2) whether the alternative is sufficient to prevent harm or injuries the individual may inflict upon himself or others.  
M.M.
, at ¶ 12.

[¶20] C.H. claims the district court was clearly erroneous to find involuntary hospitalization is the least restrictive form of appropriate treatment because no evidence established he poses a threat towards himself or others.  Rather, C.H. argues the evidence established he was able to take care of his physical needs, and he has not been physically violent.  We hold the district court’s finding is not clearly erroneous.  Both psychiatrists testified inpatient hospitalization was currently the only adequate form of treatment for C.H.  Without hospitalization, the psychiatrists stated C.H.’s mental illness would worsen, which would increase the potential that he would personally suffer harm or inflict it upon others.  C.H. also testified he quit taking his medication shortly after his most recent release from the state hospital, and Pryatel testified C.H. has “a history of poor medication compliance.”  C.H.’s history makes less intrusive treatment programs unreasonable alternatives.  We hold the district court’s finding that involuntary hospitalization is the least restrictive form of appropriate treatment is not clearly erroneous.  We affirm the district court order for involuntary hospitalization and treatment.

C.

[¶21] C.H. argues the district court erred by ordering involuntary treatment with medication.  Under N.D.C.C. § 25-03.1-18.1(1)(a), a district court may order involuntary treatment with medication if a treating psychiatrist and an independent psychiatrist certify:

(1) That the proposed prescribed medication is clinically appropriate and necessary to effectively treat the patient and that the patient is a person requiring treatment;

(2) That the patient was offered that treatment and refused it or that the patient lacks the capacity to make or communicate a responsible decision about that treatment;

(3) That prescribed medication is the least restrictive form of intervention necessary to meet the treatment needs of the patient; and

(4) That the benefits of the treatment outweigh the known risks to the patient.

“[T]he legislature intended that forced medication orders may only be issued after all four factors under N.D.C.C. § 25-03.1-18.1(1)(a) have been [demonstrated] by clear and convincing evidence.”  
Interest of T.E.
, 2008 ND 86, ¶ 12, 748 N.W.2d 677.  In addition, in determining whether involuntary treatment with medication is necessary, the legislature identified several non-exclusive factors for the courts to consider:

(1) The danger the patient presents to self or others;

(2) The patient’s current condition;

(3) The patient’s treatment history;

(4) The results of previous medication trials;

(5) The efficacy of current or past treatment modalities concerning the patient;

(6) The patient’s prognosis; and

(7) The effect of the patient’s mental condition on the patient’s capacity to consent.

N.D.C.C. § 25-03.1-18.1(2)(a).

[¶22] C.H. argues the district court erred by ordering involuntary treatment with medication because Pryatel acknowledged the recommended medications have a variety of potential side effects, and C.H. testified he quit taking his medication following his last involuntary hospitalization due to the side effects.  C.H. also argues the district court should not have ordered involuntary treatment with medication because it goes against his wishes, and he should have a voice in determining his treatment.

[¶23] We hold the district court did not err by ordering involuntary treatment with medication.  Both psychiatrists testified the proposed medication is clinically appropriate and necessary to treat C.H., and it is the least restrictive form of appropriate  treatment.  Pryatel stated the benefits of the proposed medication outweigh the risks.  In addition, C.H. testified he has refused medication since his most recent commitment and quit taking his medication shortly after his most recent release from the state hospital.  Thus, the district court correctly found the State met the requirements for treatment with involuntary medication under N.D.C.C. § 25-

03.1-18.1(1)(a).  The psychiatrists’ testimony regarding the factors listed in N.D.C.C. § 25-03.1-18.1(2)(a) also support the district court order.  Pryatel testified C.H. has responded well to medications in the past, and his prognosis is good if he continues to take them.  We affirm the district court order for involuntary treatment with medication.

III.

[¶24] We hold the district court’s findings that C.H. is a person requiring treatment and involuntary hospitalization is the least restrictive form of appropriate treatment are not clearly erroneous, and the district court did not err by ordering involuntary treatment with medication.  We affirm the district court orders.

[¶25] Carol Ronning Kapsner

Mary Muehlen Maring

Daniel J. Crothers

Gerald W. VandeWalle, C.J.

I concur in the result.

Dale V. Sandstrom